S11A0628, S11X0699. THE STATE v. CLEMENTS; and vice versa.

(715 SE2d 59)

HUNSTEIN, Chief Justice.

Derrick Clements was charged with malice murder and other crimes arising out of the 1997 shooting death of Tanika Stevenson. In 1999 a jury acquitted Clements of malice murder but found him guilty of felony murder, armed robbery, kidnapping with bodily injury, entering an automobile with intent to commit theft and possession of a firearm during the commission of a felony. Although Clements filed a timely motion for new trial, the motion was not ruled upon until 2010 when the trial court granted the motion on certain grounds and denied it on other grounds.[1] We granted the State's application for interlocutory appeal to review the trial court's ruling. For the reasons that follow, we reverse the trial court in Case No. S11A0628 and, finding no reversible error in the matters raised by Clements in his cross-appeal, we affirm the trial court in Case No. S11X0699.

1. The judge who granted Clements' motion for a new trial did not preside over the trial itself and did not hear any live testimony at the hearing on the motion other than that from Clements' trial counsel regarding an ineffectiveness claim not at issue in these appeals. Accordingly, as to the issue raised in these appeals, the successor judge's factual rulings are not accorded the same broad deference given to findings by the presiding judge. See *Head v. CSX Transp.*, 271 Ga. 670 (2) (524 SE2d 215) (1999). Moreover, the grant of a motion for new trial on special grounds involving a question of law is reviewed de novo and reversed if the trial court committed legal error. See *O'Neal v. State*, 285 Ga. 361 (677 SE2d 90) (2009). The State contends the successor judge erred by granting a new trial after the successor judge found that the presiding judge manifestly abused his discretion for failing to dismiss a juror in this case. We agree with the State and reverse for the following reasons.

---

[1] The crimes occurred on August 1, 1997. Clements was indicted January 11, 1999 in Harris County on charges of malice murder, felony murder, armed robbery, kidnapping with bodily injury, entering an automobile with intent to commit theft and possession of a firearm during the commission of a felony. He was acquitted of malice murder and found guilty of the remaining charges on February 8, 1999. He was sentenced that same day to three consecutive life sentences and two consecutive five-year sentences. The life sentence for armed robbery was subsequently vacated because that offense merged with the felony murder conviction. See *Malcolm v. State*, 263 Ga. 369 (5) (434 SE2d 479) (1993). His motion for new trial, timely filed on March 5, 1999 and amended September 4, 2009, was granted September 21, 2010. This Court granted the State's application for interlocutory appeal on November 29, 2010. The State's notice of appeal was filed December 6, 2010; Clements' notice of cross-appeal was filed December 17, 2010. The appeals were docketed December 30, 2010 and January 18, 2011, respectively, for the April 2011 term in this Court and were submitted for decision on the briefs.

The record establishes that juror Henderson was among the jurors selected the first day of the trial to serve on the petit jury. After opening statements were presented, court was recessed until the following day with the jurors cautioned not to discuss the case "at any time or during the overnight with your [family] or your friends or anything like that." The following day before any evidence was presented, juror Henderson presented the presiding judge with a letter. The presiding judge read the letter for the record:

> Dear Judge, my husband saw the news this morning and came to me and said do not let them put me on this trial for Derrick Clements because I coached him in baseball. He could tell by the look on my face that it was too late. I have literally been sick over this and unsure of what I need to do. I know that I could listen to the trial and be unbiased; however, my husband is in hopes of returning to Manchester High School next year to teach again and I am afraid some people might have hard feelings toward him due to the outcome of this trial. Please tell me what I need to do.

After clarifying that the issue had only arisen that morning, the juror answered questions posed by the trial judge. In the first question, in which the trial judge noted how jury service on such a case "is not easy" but asked whether the juror could "still be fair and impartial," the juror responded that she was "sure" that she could but that she "wanted to be honest before it began and let y'all know that, you know, my husband came to me this morning and told me this." The juror acknowledged that she could still be fair and impartial "even with this disclosure that happened this morning" and that she had not "made up [her] mind" and still had "an open mind." Defense counsel then questioned the juror carefully about her husband's job situation, in which she explained that her husband used to teach at Manchester High School, was currently coaching at another high school and "has plans to going back to Manchester next year if one teacher retires that has said he was going to." Defense counsel next directly asked the juror if she felt "any pressure that your husband's opportunity to get this job would be better or increased if you were on a jury that convicted [Clements] rather than found him not guilty." The juror's answer was unequivocal: "I don't think the verdict would have any impact on him getting the job." She then explained that she hoped "that once [her husband] goes back up there, you know, the students up there wouldn't have a problem with him."

Defense counsel "rephrased" the question, asking the juror: "Do you feel or believe that how you vote in this case could make your husband's job, if he gets it, more difficult if you vote not guilty and

better if you vote guilty?" She replied, "Well, probably so. I think, you know, everybody up there is going to know about this. This is a pretty hot topic right now. And kids are going to be kids. I'm sure there will probably be a lot of people up there that will know about this case." Defense counsel had no further questions, so the prosecutor asked the juror, "Being that everybody up there probably knows about this, it could cut both ways, I would expect, is that right?" The juror agreed and reiterated that she could still be fair and impartial "regardless of all this."

The trial judge then informed the juror that she would not be excused and again obtained the juror's assurance that the matter would not "affect her decision in this case one way or the other." After the juror returned to the jury room, defense counsel moved for a mistrial on the bases of juror misconduct, in that the juror had "outside contact by her husband overnight," and juror bias, in that the juror "says that if she voted guilty [sic] it might adversely impact on her husband if he got the contract with the school." The trial judge denied the motion. As to the misconduct allegation, the trial court found that it did not warrant dismissal of the juror because the juror had not discussed the merits of the case with her husband and their discussion was limited to the husband pleading with her not to be on the case, which, as the trial judge noted, served to indicate the husband's ignorance of the fact that she had already been selected. As to the juror bias allegation, the trial judge found that the juror had not been tainted by the discussion with her husband and had no fixed opinion about the case. The trial judge specifically based his finding upon his personal observation of the juror as to her sincerity and truthfulness. The proceedings then resumed. As noted above, the jury acquitted Clements of malice murder and convicted him of felony murder and the remaining charges.

The successor judge, in his order granting Clements' motion for a new trial on the special ground of juror bias, correctly recognized that juror Henderson had "expressly stated that her husband asked her not to be a juror" and that "a verdict of not guilty might make her husband's job more difficult." The successor judge then pointed to the juror's "clear" violation of the trial court's order not to discuss the case with others when she engaged in a conversation that "went so far as to discuss the ramifications [that] a not guilty verdict would have on [the husband's] possible new job" and noted the juror's "apprehension that [her] interest would be affected by the verdict." However, in rejecting the presiding judge's decision not to remove juror Henderson, the successor judge based his ruling on the fact that juror Henderson "may have been affected by the apprehension that [her] own interests would be affected, either favorably or prejudicially, by the rendition of one verdict rather than another,"

quoting *Temples v. Central of Ga. R. Co.*, 15 Ga. App. 115, 127 (82 SE 777) (1914).[2] In so ruling the successor judge identified the "husband's job prospect" as the juror's personal interest.

As an initial matter, we note that, although the successor judge referenced the impropriety of the juror's conduct in discussing her service on the jury with her husband without analyzing the matter further,[3] the record supports the presiding judge's decision that the irregularity presented here was inconsequential in light of the uncontradicted evidence that juror Henderson and her husband did not discuss the merits of the case but only her selection for the jury. See generally *Lamons v. State*, 255 Ga. 511, 512 (340 SE2d 183) (1986) (while there is a presumption of prejudice to the defendant when an irregularity in the conduct of a juror is shown and the burden is on the prosecution to show beyond a reasonable doubt that no harm has occurred, "[w]e have also recognized that some irregularities are inconsequential"). "Where a juror's unauthorized contact with another does not involve discussion about the merits of the case, such an irregularity will not necessarily require a new trial. [Cit.]" *Henry v. State*, 265 Ga. 732, 738 (7) (a) (462 SE2d 737) (1995) (sequestered juror had unauthorized contact with girlfriend but no harm where facts established conversation did not involve discussion about the merits of the case). See also *Holcomb v. State*, 268 Ga. 100 (2) (485 SE2d 192) (1997) (the substance of the communication involved in an incidence of juror misconduct, having been established without contradiction, proved beyond a reasonable doubt that no harm occurred); *Sims v. State*, 266 Ga. 417, 420 (3) (467 SE2d 574) (1996) (no reversible error arising out of juror misconduct by violating court orders not to discuss the case because the substance of the communication was established without contradiction and the statements "did not involve extrajudicial information, or demonstrate that they were deliberating the case prior to the close of evidence, or that one juror was attempting to persuade another on any issue or testimony in the case"). Thus, we hold that the juror's action in discussing her jury service with her husband, while improper, was not so prejudicial as to have contributed to the conviction and was harmless beyond a reasonable doubt. See *Holcomb*, supra at 103 (2) (in order for juror misconduct to upset a jury verdict, it must have been so prejudicial that the verdict is deemed inherently lacking in due process).

With respect to the issue of juror bias, however, we conclude that

---

[2] The successor judge improperly attributed the quotation to *Gormley v. Laramore*, 40 Ga. 253, 253-254 (1869), which is the authority cited in *Temples*, supra.

[3] While the juror did not testify that she and her husband directly discussed the matter, that discussion was implicit in her answers.

the successor judge clearly erred by identifying the "husband's job prospect" as the source of the juror's concern because the transcript establishes that the juror was unequivocal that her verdict would not have "any impact on [her husband] getting the job." Juror Henderson was not concerned about her husband's prospect of getting the job at Manchester High School should she cast a vote on a verdict one way or another. Rather, her concern stemmed from the possible impact of her jury service on her husband *after* he got the job at Manchester High School. Specifically, the juror was concerned that, once her husband got the job, "hard feelings" resulting from the verdict might make her husband's job more difficult.[4]

Regarding these potential "hard feelings," the successor judge then focused only on the juror's concerns about the effect of a verdict of "not guilty" and erred by ignoring the juror's express acknowledgment that *any* verdict rendered in the case had the potential to make her husband's job more difficult, i.e., that it would "cut both ways." Rather, as the colloquy set forth earlier established, and as reflected in the presiding judge's comments, it is apparent that the juror's concern was based on the fact that she had been selected to serve on the jury in a high-profile case in a small community where any verdict, whether acquittal or conviction, would likely result in some members of that community having "hard feelings" against the spouse of a participating juror.

Based on our review of the record, we find nothing that supports the successor judge's conclusion that the concern expressed by juror Henderson affected in any degree her ability to serve as a fair and impartial juror whose verdict would be based solely upon the evidence and the law as set forth in the trial court's charge. Compare *Cummings v. State*, 280 Ga. 831 (6) (632 SE2d 152) (2006) (juror removed based on her fears arising from pressure she felt to find defendant not guilty due to relationships among defendant, victim and juror's niece and daughter); *Weathersby v. State*, 263 Ga. App. 341 (4) (587 SE2d 836) (2003) (juror in rape and sexual molestation case removed where juror's husband had been arrested for sexual molestation in the same county and juror was worried about the impact her vote on a verdict might have on her husband's case). The presiding judge did not abuse his discretion by determining from juror Henderson's answers to his targeted questions that the juror was truthful and sincere as to her assertion that she had no fixed and definite opinion about Clements' guilt or innocence and that she was

---

[4] Although Juror Henderson expressed her concern about the feelings of "some people," it is apparent from the transcript that her concern was based on the possibility that some students at the high school might make problems for her husband due to her jury service.

able to set aside her concern about the impact of any verdict on her husband's future job and decide the case based upon the evidence or the court's charge upon the evidence. See, e.g., *Ledford v. State*, 289 Ga. 70 (8) (b) (709 SE2d 239) (2011) (no abuse of discretion in refusing to excuse juror whose wife had learned about a murder on the bike trail where the crime occurred and had expressed her unwillingness to use the trail again).

Although the decision to grant a new trial is addressed to the sound discretion of the judge who saw the witnesses and heard the testimony, the scope of discretion is not as extensive when it is exercised by a judge who did not preside at the trial and heard no pertinent live testimony at the hearing on the motion for new trial. *Head v. CSX Transp.*, supra, 271 Ga. at 672 (2); *Throgmorton v. Trammell*, 90 Ga. App. 433 (2) (83 SE2d 256) (1954); *Williams v. State of Ga.*, 27 Ga. App. 224 (107 SE 620) (1921). While the presiding judge in this case was uniquely positioned to observe a juror's demeanor and thereby to evaluate his or her capacity to render an impartial verdict, see, e.g., *Greene v. State*, 268 Ga. 47 (485 SE2d 741) (1997) (discussing presiding judge's assessment of potential jurors), the successor judge here stood in no better position than an appellate court in reviewing a cold record in regard to determining whether the presiding judge abused his discretion in refusing to remove a juror.[5] Given the factual errors by the successor judge regarding the finding about the husband's "job prospect" and the juror's explicit acknowledgment that her concerns applied to any verdict she might return, in addition to the presiding judge's express findings as to the juror's truthfulness and sincerity regarding her impartiality and fairness, we find that the successor judge erred by granting Clements a new trial on the basis of juror bias.

2. We next address the challenges raised by both the State and Clements to the trial court's rulings regarding the sufficiency of the evidence to support the verdicts. Specifically, the State asserts error in the trial court's ruling that the evidence at trial was not sufficient to support Clements' conviction of entering an automobile with the

---

[5] In this regard we note that, in ruling upon this special ground in Clements' motion for new trial, the successor judge expressly chose to use the appellate standard of manifest abuse of discretion as set forth in *Kim v. Walls*, 275 Ga. 177 (563 SE2d 847) (2002), a case that involved the removal for cause based on bias of a potential juror during voir dire. The replacement of a sitting juror is actually guided by OCGA § 15-12-172, see, e.g., *Gresham v. State*, 303 Ga. App. 682 (1) (695 SE2d 73) (2010) (replacement of alternate juror for misconduct governed by OCGA § 15-12-172), and abuse of discretion is the standard applied on appeal to a trial court's decision whether or not to replace a juror. See *Cummings v. State*, supra, 280 Ga. at 834 (6). We intimate no opinion, however, whether the successor judge acted properly by applying an appellate standard of review to the presiding judge's actions when ruling on the motion for new trial. But see OCGA § 5-5-25 (setting forth standard for grant of motion for new trial on special grounds).

intent to commit a theft. In his cross-appeal, Clements asserts the trial court erred by finding the evidence at trial was sufficient to uphold his conviction of kidnapping with bodily injury.

(a) The evidence adduced at trial established that the victim and Clements were involved in a sexual relationship that Clements, a married man, had kept secret from his wife. The victim was approximately seven weeks pregnant with Clements' child. On the day of the crimes, the victim was videotaped purchasing a milkshake at a local fast food restaurant around 5:00 p.m. A park ranger at the F. D. Roosevelt State Park found the victim's car just after 8:00 p.m. that day in the parking lot to a scenic overlook. The ranger summoned police officers after observing the presence of blood and hair on the top of the car's trunk, blood droplets on and around the car and a pool of blood on the ground 60 inches from the rear of the car. The victim's body was subsequently found inside the trunk. Expert testimony established that she died from a gunshot wound to the back of her head; she had also sustained pre-mortem lacerations, including one to the back of her head that could have been inflicted by impact with a car bumper. The victim's pocketbook was found on the front seat of the car; it did not contain her billfold, driver's license or bank cards. Witnesses saw appellant driving his vehicle in the direction of the park around 5:15-5:30 p.m., at a time when appellant claimed in his statements to law enforcement officers that he was elsewhere. Bank documents established that, at 6:11 p.m. and 6:12 p.m. on the day of the crimes, the victim's ATM card was used to make two withdrawals in the amounts of $370 and $140 from her bank account; appellant was videotaped by bank surveillance cameras making those withdrawals. When questioned about the withdrawals, appellant initially denied making them and challenged the investigating officer to prove otherwise; appellant admitted to withdrawing the money only after he was shown the bank videotape, at which time he claimed the victim had earlier given him her ATM card. He told the officer that he took the money because he "had paid [the victim] to have an abortion and she was not going to have the abortion so I wanted my money back."

The evidence was sufficient to enable a rational trier of fact to find Clements guilty beyond a reasonable doubt of felony murder, armed robbery and possession of a firearm during the commission of a felony. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). We now turn to the sufficiency of the evidence as to his convictions for entering an automobile with intent to commit theft and kidnapping with bodily injury.

(b) The trial court found that there was "not one iota of evidence" to support Clements' conviction for entering an automobile with the intent to commit theft. We disagree. The victim's

pocketbook was found in her car, her billfold was missing along with her driver's license and bank cards, and Clements was videotaped using the victim's ATM card to withdraw money from her bank account shortly after her death. This evidence supports the reasonable inference that Clements entered the victim's car and took her billfold from the inside of her pocketbook so as to gain access to her ATM card and make the bank withdrawals. This evidence was sufficient to enable a rational trier of fact to find Clements guilty beyond a reasonable doubt of entering an automobile to commit theft. *Jackson v. Virginia*, supra.

(c) Clements contends the evidence of asportation was insufficient to support his conviction for kidnapping with bodily injury under our decision in *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008).[6] Under *Garza*, whether a putative asportation was more than merely incidental to another crime depends upon four factors:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

Id. at 702. The uncontroverted facts in this case show that the victim was shot outside her car and moved approximately five feet to her car where she was then placed inside the car's trunk. Based on the pre-mortem injury to the back of the victim's head that could have been inflicted by her head hitting the car's bumper, there was evidence from which the jury could have found the victim was alive when she was placed inside the trunk. Here, while the duration of the movement may have been short, the other factors all support the verdict. See *Brown v. State*, 288 Ga. 902 (3) (708 SE2d 294) (2011) (evidence of asportation sufficient when all but one *Garza* factor supported the verdict). The movement occurred after Clements shot the victim, as evidenced by the pooled blood on the ground; the movement was not an inherent or necessary part of the shooting; and the obvious purpose of the movement was to conceal the injured victim from others who may have helped her or called for medical assistance. See *Henderson v. State*, 285 Ga. 240 (5) (675 SE2d 28) (2009) (noting that the kidnapping statute is intended to address movement serving to substantially isolate the victim from protection

---

[6] *Garza v. State* was superseded by statute for offenses occurring after July 1, 2009. See OCGA § 16-5-40; *Hammond v. State*, 289 Ga. 142 (710 SE2d 124) (2011).

or rescue).

We therefore conclude that the evidence was sufficient for the jury to find that the asportation element of kidnapping, as interpreted in *Garza*, was proven in this case and that a rational trier of fact was authorized to find Clements guilty beyond a reasonable doubt of kidnapping with bodily injury. *Jackson v. Virginia*, supra.

3. We find no error in the admission of testimony by an investigating officer who, after defense counsel tried to impeach him on cross-examination as to the accuracy of the notes he took during the investigation, testified on re-direct that he was "one of the most honest agents in the world" in regard to the accuracy of those notes. See *Hardy v. State*, 293 Ga. App. 265, 269 (4) (666 SE2d 730) (2008) (finding no error where witness, whose veracity was challenged on cross-examination, acknowledged affirmatively on re-direct that she was "telling the truth about everything"). See also *McClendon v. State*, 287 Ga. App. 238 (3) (651 SE2d 165) (2007) (no error on re-direct to allow police officer, whose report had been challenged for accuracy on cross-examination, to testify about the proper manner in which the officer detailed matters in report).

4. Clements contends the trial court committed reversible error when, during its orientation statements to the jury about the judicial system and the manner in which the trial would be presented, it explained that the attorneys would submit

> requests to charge, that is theories of law that they think are applicable to the trial of this case. The Court will consider those and discuss with the lawyers what charges will be given, but what charge of the law is to be given rests solely on the shoulders of the Court and if the Court makes a mistake, not intentionally, but Courts make mistakes, *there is a higher court to look over what I have done on the record and make a decision as to whether or not I made a glaring mistake or a crucial mistake or a mistake on purpose* [sic].

(Emphasis supplied.) We recently reversed a conviction in which the trial court, in response to a jury inquiry about certain trial exhibits, informed the jury that it could not give the jury the exhibits because, if the court did so, "we would have to try the case all over again" and that "it would be reversible error" for the court to give the jurors those exhibits. *Gibson v. State*, 288 Ga. 617, 618 (2) (706 SE2d 412) (2011). In that case, the quoted language regarding potential error "could have intimated to the jury that the requested exhibits were harmful to the defendant and that the trial court believed the defendant was guilty." Id. at 619 (2). Unlike *Gibson*, however, the trial court's statements here were in the context of juror orientation

at the start of the trial when no evidence had been adduced and opening statement had not yet been held. We thus find this case to be more comparable to *Bearden v. State*, 159 Ga. App. 892 (3) (285 SE2d 606) (1981), in which the trial court, when talking about the criminal justice system, related to the jurors "that there were two courts in Atlanta, the Court of Appeals and the Supreme Court, which could sit in judgment and correct any errors that the trial court might make." In finding the trial court's statement to be error but not reversible error, the Court of Appeals explained:

> "The Supreme Court has repeatedly held references should not be made to the reviewing courts by court or counsel except to cite their decisions. [Cits.]" [Cit.] However, not every reference to the appellate courts during trial is reversible error. [Cits.] The references here to the curative powers of the appellate courts must be considered in the context of juror orientation of the judicial system and how it functions. Juror orientation is recommended by the American Bar Association but only by use of a juror handbook — thus avoiding the pitfalls encountered in the instant case. [Cit.] Where, as here, this form of orientation occurred before any evidence was introduced, did not convey or intimate any opinion of the trial judge ([cit.]), nor lessen the sense of responsibility of the jurors ([cit.]), we find such abstract references to the appellate courts not to require reversal. [Cit.]

Id. at 893 (3). As in *Bearden*, we find that the trial court's statement here, while error, does not require reversal.[7]

5. For the reasons set forth in *Shadron v. State*, 275 Ga. 767 (3) (573 SE2d 73) (2002), we find no merit in Clements' final enumerated error challenging the trial court's instruction regarding the role the grand jury played in indicting Clements. The charge given by the trial court here was substantially similar to the charge discussed in *Shadron* and, in light of the charge as a whole, "we do not perceive that the instruction given prejudiced [Clements] in any way, and particularly did not impact either the presumption of innocence or the State's burden of proof." Id. at 769-770 (3).[8]

6. In conclusion, we reverse the trial court's ruling in Case No.

---

[7] To the extent dicta in *Price v. State*, 149 Ga. App. 397 (2) (254 SE2d 512) (1979), reaches a contrary result, it is overruled.

[8] The trial court made specific reference to the State's burden to prove its case beyond a reasonable doubt, albeit not as immediately in the challenged instruction as in *Shadron*, supra; it instructed the jury that the indictment should not be considered as evidence; and it

S11A0628 and affirm its ruling in Case No. S11X0699. We accordingly reinstate Clements' convictions and sentences for felony murder, kidnapping with bodily injury, entering an automobile with intent to commit theft and possession of a firearm during the commission of a felony.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Carley, P. J., and Nahmias, J., who concur specially in part.*

NAHMIAS, Justice, concurring in part and concurring specially in part.

I join the majority opinion except for Division 4, which I join in the judgment only for the reasons given in my dissent in *Gibson v. State*, 288 Ga. 617, 620 (706 SE2d 412) (2011). It is nice to see the Court so quickly starting to chip away at *Gibson*, even if the process is somewhat awkward. To sidestep *Gibson*, the majority relies on *Bearden v. State*, 159 Ga. App. 892 (285 SE2d 606) (1981), a case not cited by the *Gibson* majority. But to do that, the majority has to overrule another Court of Appeals case very similar to *Bearden*, see *Price v. State*, 149 Ga. App. 397 (254 SE2d 512) (1979), even though the *Gibson* majority cited *Price* favorably, see 288 Ga. at 619. In any event, the result is right, and perhaps this case presages the day when the Court will not just distinguish *Gibson* but overrule it.

I am authorized to state that Presiding Justice Carley joins in this opinion.

DECIDED SEPTEMBER 12, 2011.

*Julia Fessenden Slater, District Attorney, Jennifer E. Dunlap, Assistant District Attorney*, for appellant.
*Zell & Zell, Rodney S. Zell*, for appellee.

explained that the indictment was simply the means by which a case is brought before a jury. "[T]he jury was not misled about the State's burden of proof at any stage of the proceeding and the charge did not diminish the presumption of innocence." Id. at 770 (3).