## S11A1973. SHANK v. THE STATE.

(725 SE2d 246)

NAHMIAS, Justice.

Appellant Bobbie Charles Shank appeals his 1996 convictions for malice murder and other crimes in connection with the bludgeoning death of Mark Garner. We affirm.[1]

1. The evidence at trial, viewed in the light most favorable to the verdict, showed the following. On Saturday morning, January 27, 1996, Appellant went to the home of Mark and Tracy Garner in Warner Robins, Georgia. The Garners frequently sold Appellant marijuana, and he had been in their home on many occasions. Ms. Garner was upstairs sleeping, so Mr. Garner let Appellant in. Appellant had come for marijuana, but Mr. Garner refused to give him any more because he already owed the Garners $450. Appellant and Mr. Garner began arguing loudly in the kitchen. Ms. Garner awoke and recognized Appellant's voice, although she could not tell exactly what the two men were saying. She came down to the kitchen, where she saw Appellant, who was wearing a zip-up jacket and jeans; although Appellant had his back to Ms. Garner, she still recognized him. Mr. Garner was sitting in a chair in front of Appellant, his head and face covered in blood. When Appellant realized that someone was standing behind him, he turned around and struck Ms. Garner in the head, knocking her unconscious. Appellant left the Garners' home and returned to the hotel where he had stayed the night before. He cleaned up and checked out around noon before going to Savannah for the rest of the weekend.

Ms. Garner's stepfather, "Petey" Salter, found the Garners on the kitchen floor when he came by shortly after the attacks to drop off her five-year-old son after an overnight visit. Mr. Garner was already dead, and Ms. Garner was unconscious on the floor next to him with a portion of her brain, which was later surgically removed, protruding from her skull. She was unable to speak after the surgery, but she was able to answer questions using signals and, later, by scrawling short answers on a pad of paper. Ms. Garner repeatedly identified "Bobby" as the man who had attacked her and her

---

[1] The crimes occurred on January 27, 1996. On February 6, 1996, Appellant was indicted in Houston County for malice murder, two counts of aggravated assault, and two counts of aggravated battery. Appellant was tried on September 4-17, 1996. The jury found Appellant guilty of all charges, and the court sentenced him to life in prison for malice murder plus 20 years consecutive for one count of aggravated battery; the remaining verdicts merged. On October 7, 1996, Appellant filed a motion for new trial, which he amended on September 27, 2005, and April 25, 2011. On May 12, 2011, the trial court conducted a hearing, and on May 19, 2011, the court summarily denied Appellant's motion. After Appellant filed a timely notice of appeal, the case was docketed in this Court for the September 2011 term and submitted for decision on the briefs.

husband, and she picked Appellant out of a photographic lineup.

The police searched 708 Arrowhead Trail, Appellant's home, and found a jacket and a sweatshirt soaking in bleach. A search of Appellant's vehicle revealed that the driver's side seat had been scrubbed clean. The cleaning staff at the hotel where Appellant stayed the night before the crimes told the police that a bloody washcloth and bloody sheets were found in his room when it was cleaned on the day of the crimes after he checked out.

By the time of trial, Ms. Garner had regained the ability to speak, and she identified Appellant as the man she saw and heard in the kitchen who attacked her and her husband. She also testified that she was referring to Appellant when she repeatedly identified the assailant as "Bobby" when she was in the hospital. The forensic examiner testified that Mr. Garner was killed with a large, double-bladed instrument like a machete or two-headed ax, and he found at least seven distinct chopping injuries on Mr. Garner's head. Ms. Garner's wounds were caused by the same or a similar item.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)).

2. Appellant contends that the trial court erred in refusing the jury's request to be recharged on reasonable doubt. An hour into its deliberations, the jury sent a note saying, "We would like a clarification or definition of 'Reasonable Doubt.' " The court responded in writing, "I cannot clarify or define 'reasonable doubt' other than to simply read the charge that I gave you again. What is your response?" After three more hours of deliberations passed with no response from the jury, the State raised the issue, but Appellant objected to a recharge at that time, and the court did not recharge the jury.

Appellant now contends that the court erred in not recharging the jury, but Appellant invited the alleged error, and it therefore provides no basis for reversal. See *Barnes v. State*, 269 Ga. 345, 356 (496 SE2d 674) (1998). See also *Cheddersingh v. State*, 290 Ga. 680, 682-684 (724 SE2d 366) (2012) (explaining that affirmative waiver, as opposed to mere forfeiture by failing to object, prevents a finding of "plain error" under OCGA § 17-8-58 (b)). Moreover, the jury never answered the court's request for a response and reached a verdict without further inquiry about reasonable doubt. Under these cir-

cumstances, the court did not err, much less plainly err, by considering the jury's request for a recharge to have been tacitly withdrawn. See *Johnson v. State*, 254 Ga. 591, 602 (331 SE2d 578) (1985) (finding no reversible error where the jury, after requesting a recharge, withdrew the request and returned a verdict).

3. Appellant argues that the trial court erred in allowing the jury to rehear portions of the trial testimony during deliberations. In its note about reasonable doubt, the jury asked the court two additional questions: "What time Saturday Morning, Jan 27th, did Pete Salter begin calling Mark & Tracy's apt?"; and "During the search of 708 Arrowhead, did [police investigator] Gaylen Noll testify that he smelled Clorox/Bleach in the 'white bucket' "? The court responded in writing that it would have the court reporter locate the requested testimony, which was then read to the jury after a lunch break.

A trial court, in its discretion, may allow a jury to rehear requested parts of the evidence after deliberations have begun. See *Puga-Cerantes v. State*, 281 Ga. 78, 80 (635 SE2d 118) (2006). At trial, Appellant argued that having the jury rehear portions of the transcript would place improper emphasis on certain parts of the testimony. Although a cautionary instruction addressing Appellant's concern was not required, see *Stephens v. State*, 261 Ga. 467, 468 (405 SE2d 483) (1991), after the requested testimony was read to the jury, the court instructed the jury as follows:

> Ladies and gentlemen, we are very reluctant to go back and recite to you testimony, because the danger in doing that is self-evident. The same being that we are concerned that you, because you heard something twice, may give it more weight than you would something else that you've only heard once, just by virtue of hearing something twice. So let me caution you that you are to consider the evidence in its entirety and not give this particular testimony that's been read back to you any more weight just because you heard it twice. Again, consider the testimony in its entirety in reaching your decision in this case.

The trial court's instruction adequately addressed Appellant's concern. There was no abuse of discretion.

4. Appellant maintains that the trial court erred in denying his motion for a mistrial based on improper juror contact and in denying his new trial motion raising the same claim. We disagree.

After Salter testified at trial as the State's first witness, juror Otis Milner disclosed that he and Salter were classmates 25 years ago and remained good friends. The court conducted a brief examination of Milner and decided to allow him to continue serving as a juror.

(Appellant does not enumerate any error in that decision.) During a break on the second day of deliberations, Milner went to the break room to get a soft drink. On the way downstairs, he saw juror Cissy Black, who said, "watch out, there's someone down there" in the break room. When Milner walked into the room, he saw Salter sitting half-asleep at a table with his head propped up on one hand. Without lifting his head, Salter said to Milner in a joking manner, "We're waiting on y'all." Milner cut Salter off, saying "I'm going upstairs," and then turned around and went back to the jury room. Milner did not tell the other jurors about the incident, although he exchanged a look with Black that Milner described as "just an acknowledgment to her without words that, man, I know what you meant."

The jury returned its verdict within an hour of the incident. Later that afternoon, the State found out about the encounter and notified the trial court, which directed the parties and their counsel to appear at a hearing the following morning. At the hearing, Appellant was told what had happened, and he moved for a mistrial. The court heard testimony from Milner and Salter and the jury foreman, who confirmed that Milner did not relate the incident to the other jurors when he returned to the jury room. Milner and Salter gave consistent testimony about the break room encounter.

Salter denied being in the courtroom when the trial court gave instructions prohibiting contact between witnesses and jurors and denied being told by anyone prior to the incident that he was not allowed to speak to the jurors about matters other than the case. Salter also denied trying to influence Milner. Milner testified that Salter did not talk to him about the case, that the incident had no effect whatsoever on his vote, and that the encounter did not intimidate him or make him mad at Salter.

The trial court denied Appellant's mistrial motion, noting that Milner is "physically imposing" and has a "very self-assured" voice and demeanor. The court found that the exchange had no effect on Milner's vote, that Milner did not even construe Salter's comment "as an attempt to encourage him to do one thing or the other," and that the incident was harmless. The court later denied Appellant's new trial motion, which raised the same issue.

A defendant is entitled to trial by a jury untainted by improper influence. See *Collins v. State*, 290 Ga. 505 (722 SE2d 719) (2012). "[C]ommunication between a juror and the victim's family during trial is improper," and "[i]mproper communication with a juror raises a presumption of prejudice to the defendant, which the State must rebut beyond a reasonable doubt." Id. at 506. However, we have recognized that some improper communications are " 'inconsequential,' " and " '[w]here a juror's unauthorized contact with

another does not involve discussion about the merits of the case, such an irregularity will not necessarily require a new trial.'" *State v. Clements*, 289 Ga. 640, 643 (715 SE2d 59) (2011) (citations omitted). To upset a jury verdict, the improper communication must have been "so prejudicial that the verdict is deemed inherently lacking in due process." Id. at 643.

The substance of the communication between Milner and Salter was undisputed, it lacked any reference to the merits of the case, and it was not conveyed to the other jurors. After a thorough inquiry into the matter, the trial court found that the exchange was momentary and had no effect on the verdict. The record fully supports this conclusion and leaves no reasonable doubt that the juror contact was inconsequential and caused Appellant no prejudice. See *Clements* at 643.

5. Finally, Appellant asserts that he received ineffective assistance of counsel. To prevail on this claim, Appellant must show that his counsel's performance was constitutionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SC 2052, 80 LE2d 674) (1984).

(a) Appellant alleges broadly that his counsel did not adequately investigate the case. However, Appellant has failed to identify any particular witness whom counsel unreasonably failed to interview or any specific line of investigation that counsel should have, but did not, pursue. There is a strong presumption that counsel's conduct falls within the broad range of reasonable professional conduct, and generalized claims to the contrary not supported by affirmative evidence are insufficient to show deficient performance. See *Hayes v. State*, 279 Ga. 642, 645 (619 SE2d 628) (2005). Appellant also failed to show that a more thorough investigation would have yielded any significant exculpatory evidence and thus failed to establish prejudice resulting from the allegedly deficient investigation. See *Franks v. State*, 278 Ga. 246, 263 (599 SE2d 134) (2004).

(b) Appellant claims that his trial counsel performed deficiently because they did not provide him copies of all available discovery materials. However, there is no per se rule requiring counsel for criminal defendants to provide them with copies of all discovery materials, and Appellant has not explained why, in his case, a decision not to provide him with certain materials fell outside the bounds of reasonable professional conduct. See *Henry v. State*, 279 Ga. 615, 616 (619 SE2d 609) (2005). And even if counsel were deficient in this regard, Appellant has failed to explain how this deficiency undermines confidence in the outcome of his trial. See id.

(c) Appellant finally contends that he received ineffective assis-

tance of counsel because his trial counsel failed to pursue his timely filed motion for new trial for approximately nine years after his conviction and sentencing; the motion was pursued only after the trial court appointed new appellate counsel in 2005, and even then it took nearly six more years to resolve. One of Appellant's trial counsel testified at the motion for new trial hearing, and she confirmed that she did nothing to secure resolution of the motion for new trial after it was filed in 1996.

We do not condone this inordinate delay in the motion for new trial proceeding. This Court is unfortunately seeing such extraordinary post-conviction, pre-appeal delays with greater frequency; for just two recent examples, see *Murphy v. State*, 290 Ga. 459, n. 2 (722 SE2d 51) (2012) (reversing a conviction where the motion for new trial was pending for more than a decade); and *Hill v. State*, 290 Ga. 493, n. * (722 SE2d 708) (2012) (affirming murder conviction from 1995). These delays put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial. We therefore reiterate that it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay.

Nevertheless, in this case, even assuming that trial counsel's performance was constitutionally deficient, Appellant has failed to show that his appeal has been prejudiced by the delay. "[A]ppellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different." *Chatman v. Mancill*, 280 Ga. 253, 260-261 (626 SE2d 102) (2006) (citations and punctuation omitted). Appellant points to no change in the law or facts or loss of material evidence since 1996 that would raise a reasonable probability that the outcome of his appeal would have been different but for the delay in pursuing his motion for new trial. See *Loadholt v. State*, 286 Ga. 402, 406 (687 SE2d 824) (2010) (holding that there can be no prejudice in a delay pending appeal where the enumerations raised on appeal are without merit). Accordingly, Appellant's ineffective assistance of counsel claim on this ground fails.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 19, 2012 —
RECONSIDERATION DENIED APRIL 11, 2012.

*Jeffrey L. Grube*, for appellant.

*George H. Hartwig III, District Attorney, Marie R. Banks, Daniel P. Bibler, Assistant District Attorneys, Samuel S. Olens, Attorney*

*General, Paula K. Smith, Senior Assistant Attorney General, Jason C. Fisher, Assistant Attorney General*, for appellee.