308 Ga. 1
FINAL COPY

S19A1330. MITCHELL v. THE STATE.

ELLINGTON, Justice.

Tony Mitchell was convicted of the malice murder of Randy Lewis and related crimes following a trial before a Fulton County jury.[1] On appeal, Mitchell contends that his trial counsel rendered ineffective assistance because she failed to competently execute her chosen strategy of discrediting the jailhouse informant who testified that Mitchell had confessed to having killed Lewis. We affirm for the

---

[1] Lewis was killed on or about June 12, 2011. A Fulton County grand jury indicted Mitchell for malice murder, felony murder predicated on aggravated assault, aggravated assault, and theft by taking. Mitchell was tried in a May 11 to May 14, 2015 jury trial. The jury found Mitchell guilty on all counts. On May 15, 2015, the trial court sentenced Mitchell to serve life in prison without parole on the count of malice murder and a concurrent sentence of ten years in prison on the count of theft by taking. The trial court merged the counts of felony murder and aggravated assault with the malice murder conviction, although the felony murder count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 374 (434 SE2d 479) (1993). Mitchell filed a timely motion for new trial on June 1, 2015, which he later amended on June 26, 2018. Following a hearing, the trial court denied the motion as amended on December 14, 2018. Mitchell's timely appeal was docketed in this Court for the August 2019 term and submitted for decision on the briefs.

reasons that follow.

Viewed in a light most favorable to the verdicts, the evidence presented at trial shows the following. In June 2011, Mitchell and Lewis were roommates living in a halfway house in Fulton County. The house was a duplex; Mitchell and Lewis lived on one side and a group of approximately six to eight men lived on the other side.

Lewis worked in a nearby restaurant. He was a dependable employee who reported to work when scheduled. Lewis also owned a black sedan. He gave rides to other halfway house residents, but he did not allow other people to drive his car.

Lewis was last seen alive when he left work in the early morning of June 12, 2011. Lewis failed to report for work the following day, after which his manager called him numerous times without success and knocked on the door of his residence with no response. Witnesses saw Mitchell leave the residence he shared with Lewis during the early morning of June 12, walk to Lewis's car carrying a bag, place the bag in the trunk of the car, and drive away.

Mitchell, who was a convicted felon, wore an electronic

monitoring device. That device alerted Mitchell's parole officer that Mitchell left his residence on June 12 and had not returned by June 13, upon which a warrant was issued for Mitchell's arrest. At some point, Mitchell removed the device from his ankle.

On June 16, men living in the halfway house noticed a foul smell emanating from an open window of Lewis's and Mitchell's residence. One of the men crawled through the window and unlocked the front door. The rest of the men then entered the residence and found Lewis's body under a bed. After being called to the scene, the investigating officer saw that Lewis's body was wrapped in a sheet and that his head was, the investigator testified, "wrapped in plastic and taped." The officer also saw a rope around Lewis's neck and a lot of blood.

Lewis's car was later found parked at a Waffle House restaurant in Macon. On June 22, Mitchell was arrested in Miami, Florida on charges of shoplifting, after which he was extradited to Georgia. Once in Georgia, Mitchell was interviewed by an Atlanta Police Department detective. During the interview, Mitchell

3

acknowledged that he drove Lewis's vehicle to Macon. He claimed that he removed his ankle monitor because he had failed a drug test and expected that he would soon be arrested.

In early spring 2013, Mitchell met Stacy Bennett in the Fulton County Jail, where both men were being held. In August 2013, Bennett wrote a letter to the Fulton County District Attorney's office stating that he had information concerning the murder in Mitchell's case. Bennett testified at Mitchell's trial in 2015 that Mitchell told him the following. Mitchell lived in a halfway house with Lewis. Lewis had asked Mitchell to look at a mechanical problem with Lewis's car. Mitchell told Lewis that he could not fix the car without "some kind of box." Mitchell then asked Lewis for money, and Lewis told Mitchell to "chill" because the police had come around looking for Mitchell. After Lewis went to sleep, Mitchell struck Lewis on the head with a "brass knuckle weapon" welded with a "southwest side zone three," which consisted of "like a 'W' and then a three on it." After Mitchell hit Lewis, a struggle ensued, during which Mitchell wrapped a rope around Lewis's neck and strangled him. Mitchell

4

"pulled a trashcan in the room and he took a bag and wrapped it around the guy and put tape on it[.]" Mitchell then got in the car and headed to Florida.

At the time of Mitchell's trial, Bennett was serving a prison sentence following his conviction for aggravated assault and other crimes. He testified that he had not been promised anything in exchange for his testimony but that an assistant district attorney was writing a letter on his behalf to the parole board.

The medical examiner who supervised Lewis's autopsy concluded that he died due to strangulation and blunt force head trauma. The medical examiner described Lewis's head as completely encased in plastic packing tape wrapped "in several layers and more or less a couple of inches thick[.]" Photographs taken during the autopsy showed, as described by witnesses, a "W" or "3" shaped wound pattern over Lewis's ear.

1. Mitchell does not challenge the sufficiency of the evidence to support his convictions. Nevertheless, in accordance with this Court's standard practice in appeals of murder cases, we have

reviewed the record and conclude that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Mitchell guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Mitchell contends that the trial court erred in finding that he received effective assistance of counsel. He argues that his trial counsel's performance fell below an objective standard of reasonableness because she failed to use readily available evidence to further her express trial strategy of discrediting Bennett, the jailhouse informant. He argues that trial counsel's deficient performance prejudiced him because, apart from Bennett's testimony, the State's case was circumstantial.

To succeed on his claim of ineffective assistance, Mitchell must establish that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Mitchell must establish that his

6

attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. See *Henderson v. State*, 304 Ga. 733, 735 (3) (822 SE2d 228) (2018). In reviewing an ineffectiveness claim, this Court

> must apply a strong presumption that counsel's conduct fell within the wide range of reasonable professional performance. Thus, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

Id. (citation and punctuation omitted).

To establish prejudice, Mitchell must prove that there is a reasonable probability that, but for counsel's deficiency, the result of his trial would have been different. See *Strickland*, 466 U. S. at 694. We need not address both parts of the *Strickland* test if Mitchell makes an insufficient showing on one. See id. at 697.

The record shows that Mitchell's trial counsel interviewed Bennett before the trial. She was aware that Bennett planned to testify that Mitchell had confessed to him. Trial counsel came to

7

believe that Bennett was not being truthful and that he had received his information about the details of the case from looking at Mitchell's pre-trial discovery. Trial counsel was aware that Mitchell had been in physical possession of his discovery while in jail through her discussions with Mitchell. Her strategy was to show that Bennett was lying and that he was seeking favors from the State.

At trial, Mitchell's counsel cross-examined Bennett at length. In response to her questioning, Bennett acknowledged that he had spent more than 13 years of his life in prison, that he would "do anything to get out" of prison, that the assistant district attorney was writing a letter to the parole board on his behalf, and that when he had met earlier with the assistant district attorney he had told the prosecutor that he wanted to go home in exchange for his testimony. Bennett also testified on cross-examination that he could have accessed Mitchell's cell, at least as long as he was with Mitchell, and that he understood that discovery included the indictment and witness statements. He agreed that Mitchell had told him that Mitchell "used plastic bags and wrapped that around

8

Mr. Lewis's head."

During closing argument, trial counsel argued, among other things, that although Bennett claimed plastic was wrapped around Lewis's head, the evidence showed that "it was tape. It wasn't plastic bags, it was tape." She argued that Bennett got the incorrect detail that it was bags from Mitchell's discovery, and maintained that Bennett had "testified that he had access to [Mitchell's] cell." She argued that Bennett's knowledge of "the wound being in the shape of a three or a 'W'" also came from Mitchell's discovery. She asserted that "13 years of [Bennett's] life he's been in prison. And he told you he would do anything to go home."

(a) Mitchell claims that his trial counsel was ineffective in failing to investigate and then expose the circumstances of the case pending against Bennett in Fulton County Superior Court at the time Bennett wrote to the district attorney's office that he had information about the murder in Mitchell's case. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances,

9

applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U. S. at 691. See also *Barker v. Barrow*, 290 Ga. 711, 713 (1) (723 SE2d 905) (2012) (same).

Trial counsel testified at the motion for new trial hearing that although she was aware that Bennett was facing charges when he was housed with Mitchell, she did not investigate the circumstances of that case. Mitchell points out that at the time Bennett wrote the letter to the district attorney's office in August 2013, he had not been tried on the pending charges.[2] That trial occurred later the same month. Mitchell posits that if the case pending against Bennett was strong, then Bennett's motivation to help himself by accessing Mitchell's discovery and fabricating Mitchell's confession would also

---

[2] The record shows that Bennett was indicted in January 2013 for two counts of armed robbery and other offenses. On August 13, 2013, Bennett wrote a letter to the office of the Fulton County district attorney stating that he had "some info concerning the murder case of Tony Mitchell." The district attorney's office received that letter on August 30, 2013. Before the district attorney's office received the letter, a jury found Bennett guilty at a trial commencing on August 19, 2013, of one count of aggravated assault, two counts of false imprisonment, theft by taking, and possession of a firearm by a convicted felon, but not guilty of the armed robbery and other charges. Bennett's sentence of "12 years to serve 5 years, balance of 7 years probated," was entered on December 13, 2013. An investigator with the district attorney's office met with Bennett about his letter after Bennett was sentenced.

be strong. As to the allegedly dire circumstances of that case, Mitchell showed at the hearing on his motion for new trial that Bennett had been facing two counts of armed robbery, among other charges; Bennett had been denied bail; his co-defendant had pled guilty and been sentenced upon condition she testify truthfully at his trial; the State had filed notice of its intent to seek recidivist punishment; and Bennett faced a possible sentence of life without parole. Mitchell also contends that Bennett had been "at odds with his trial counsel" based on an order for mental evaluation showing that Bennett's attorney had requested the evaluation on grounds that, among other things, Bennett was refusing to follow the advice of counsel.

Pretermitting whether trial counsel's failure to investigate Bennett's case was deficient, Mitchell has not shown prejudice. The circumstances of Bennett's case did not shed any direct light on whether Bennett accessed Mitchell's discovery. There was never a plea agreement in Bennett's case arising from his testimony at Mitchell's trial; Bennett did not ask for a deal in his letter to the

11

district attorney; and Bennett's understanding that an assistant district attorney would write a letter to the parole board was elicited on direct and cross-examination. Nor did the evidence show that even if Bennett accessed Mitchell's discovery, he must have done so before writing the letter to the district attorney or before the trial on the charges pending against Bennett when he wrote the letter.

Bennett's testimony at Mitchell's 2015 trial showed that he and Mitchell were housed together in the jail from March until December 2013. Bennett testified about his conviction and sentence in the case pending against him while he was housed with Mitchell, as well as the charges of which he was acquitted during that period of time, which included Bennett's acquittal on the two charges of armed robbery. According to Bennett, Mitchell knew that Bennett was acquitted of the armed robbery charges and asked Bennett about Bennett's case. Trial counsel argued in closing that Bennett had "befriended Mr. Mitchell, . . . gained his trust, . . . read his information and made up a story to the [prosecutor] . . . because . . . he would do anything to go home[.]"

As the foregoing shows, the jury was made aware of Bennett's case, of Mitchell's interest in Bennett's case after Bennett had been acquitted of the most serious charges against him, and the amount of time Bennett had to gain Mitchell's trust. It also would have been within the trial court's discretion to prohibit trial counsel from cross-examining Bennett about the potential sentence in his case in the absence of any plea deal in exchange for his testimony. See *Redding v. State*, 307 Ga. __, __ (2) (__ SE2d __) (2020). Under the circumstances, there is no reasonable probability that the result of Mitchell's trial would have been different even if the details of Bennett's case had been investigated by trial counsel and presented to the jury. See *Shank v. State*, 290 Ga. 844, 848 (5) (a) (725 SE2d 246) (2012) (claim that trial counsel was ineffective because he did not adequately investigate the case was without merit because the defendant "failed to show that a more thorough investigation would have yielded any significant exculpatory evidence and thus failed to establish prejudice resulting from the allegedly deficient investigation").

13

(b) Mitchell contends that his trial counsel was ineffective in that she failed to introduce evidence that an investigating detective's report included the erroneous assertion that the victim had a bag taped around his head. Mitchell showed at the motion for new trial hearing that a police investigator documented in a report served on the defense as part of discovery that "[t]he victim was found inside of his bedroom with a bag tapped [sic] around his head which was bloody."

Mitchell argues that to support trial counsel's theory that Bennett had accessed Mitchell's discovery and was lying about Mitchell's confession, counsel established at trial that (1) Bennett claimed Mitchell admitted to him that he used a plastic bag from a trash can and taped it around Lewis's head, (2) per the medical examiner, there was no bag taped around Lewis's head, and (3) Bennett admitted he could have gained access to Mitchell's personal effects in the jail. Mitchell maintains that an additional fact was nevertheless required for the defense to show that Bennett's information came from reading Mitchell's discovery: that the

14

investigator's report included in Mitchell's discovery contained the incorrect detail that a bag was taped around Lewis's head.

More specifically, the trial transcript shows that the investigator testified that Lewis's head was "wrapped in plastic and taped." When the investigator was recalled for questioning by the defense, trial counsel did not ask the investigator if his report referenced a bag taped around Lewis's head. Rather, she asked: "Do you recall in your report . . . giving a description of the way Mr. Lewis'[s] head was wrapped with tape?" The investigator then responded affirmatively. Mitchell argues that his trial counsel's failure to establish the readily available fact that the investigator's report also stated that a bag was taped around Lewis's head fell below an objective standard of reasonableness.

Assuming, without deciding, that trial counsel's performance was deficient as alleged, Mitchell does not show he was prejudiced. In her closing argument, trial counsel referenced Bennett's claim about the use of the bag as well as the medical examiner's testimony showing the absence of a bag, and she argued that Bennett had read

about "plastic" around the victim's head from the investigator's report and argued that "it wasn't plastic bags; it was tape." Trial counsel presented a defense based on discrediting Bennett, although it was not executed in the manner appellate counsel now finds most appropriate. The circumstantial evidence of Mitchell's guilt was also very strong. Even if we accept for the purposes of argument that trial counsel fell short in failing to introduce the contents of the investigator's report, there is not a reasonable likelihood that, but for counsel's alleged error, the outcome of the trial would have been different.

(c) Mitchell further contends that his trial counsel was ineffective in failing to show that Mitchell received his discovery because the theory of the defense was predicated on that fact. In other words, Bennett could not have gotten his information from Mitchell's discovery unless that discovery had first been delivered to Mitchell. Mitchell's first counsel in this matter, who withdrew from representation before the appearance of trial counsel, testified at the hearing on the motion for new trial that he delivered the discovery

16

to Mitchell at the jail. Thus, Mitchell posits, his trial counsel could have easily established the predicate fact that Mitchell received his discovery through the testimony of Mitchell's first counsel.

Assuming that trial counsel was deficient in failing to show that Mitchell had actually received his discovery, Mitchell cannot show prejudice. The State did not suggest at trial that Mitchell had never received his discovery, such that it would have been impossible for Bennett to have seen it. Rather, in response to questioning by the prosecutor during direct examination, Bennett maintained that he had never seen Mitchell's discovery, nor had he seen photographs of the crime scene or read any police reports or case summaries in Mitchell's case. Mitchell does not show that his trial counsel's alleged deficiency in failing to explicitly establish that he received discovery was reasonably likely to have affected the outcome of the trial.

(d) Mitchell contends that, given trial counsel's strategy of discrediting Bennett, she unreasonably failed to confront Bennett or make closing argument regarding Bennett's claim that Mitchell told

him that he hit Lewis in the head with brass knuckles, then engaged in a struggle with Lewis before strangling him with a rope. Mitchell argues that the evidence "was not indicative of a struggle between Lewis and his assailant occurring after the head wound was inflicted." He bases this assertion on evidence that the blood found at the crime scene was not widespread, but was confined to a small area.

The testimony of the medical examiner showed that Lewis was alive when he was strangled, although "either one" of the blunt force trauma to the head or the strangulation could have individually resulted in his death. However, the medical examiner opined, strangulation would "probably . . . or potentially" have caused death faster than the head injury.

The physical and forensic evidence allowed for the possibility that Lewis was struck on the head and then strangled. Mitchell does not point to any testimony showing that Lewis could not have struggled after having being hit on the head, or that the location of the blood found at the scene ruled out a struggle. It was within the

broad range of reasonable professional assistance for trial counsel to decline to confront Bennett about the alleged struggle during cross-examination and not to argue in closing that the evidence did not support the occurrence of a struggle. See *Smith v. State*, 303 Ga. 643, 648 (II) (B) (814 SE2d 411) (2018) ("[W]hether to impeach prosecution witnesses and how to do so are tactical decisions.") (citation and punctuation omitted)); *Nations v. State*, 290 Ga. 39, 43 (4) (a) (717 SE2d 634) (2011) ("The scope of cross-examination is generally a matter of trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." (citation omitted)).

(e) Mitchell contends that trial counsel was ineffective in failing to impeach Bennett with certified copies of his prior convictions, which included convictions for attempted escape and armed robbery. The jury was informed on direct examination of Bennett's felony convictions and his sentence for aggravated assault and other crimes in the case for which he was then serving time. On cross-examination, trial counsel showed that Bennett had served 13 years of his life in jail and elicited Bennett's acknowledgment that

he would do anything to get out of prison. Under these circumstances, trial counsel's failure to additionally impeach Bennett with certified copies of his prior convictions was not objectively unreasonable. *Romer v. State*, 293 Ga. 339, 344-345 (3) (a) (745 SE2d 637) (2013) (In light of the cross-examination conducted by trial counsel, it was not patently unreasonable for trial counsel not to generally impeach the witness's credibility with her prior convictions.); *Chance v. State*, 291 Ga. 241, 246 (7) (a) (728 SE2d 635) (2012) ("The decision whether to impeach a witness through introduction of certified copies of prior convictions is a matter of trial strategy." (citation and punctuation omitted)).

(f) Lastly, we consider the cumulative effect of prejudice resulting from trial counsel's allegedly deficient performance. *Schofield v. Holsey*, 281 Ga. 809 (II) n.1 (642 SE2d 56) (2007) ("[I]t is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (citation and punctuation omitted)). Here, "the cumulative prejudice from any assumed deficiencies discussed

20

in Divisions [2 (a), (b), and (c)] is insufficient to show a reasonable probability that the results of the proceedings would have been different in the absence of the alleged deficiencies." *Davis v. State*, 306 Ga. 140, 150 (3) (j) (829 SE2d 321) (2019) (citation and punctuation omitted).

In light of the foregoing, we see no merit in Mitchell's claims of ineffective assistance of trial counsel.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 10, 2020.
Murder. Fulton Superior Court. Before Judge Dunaway.
*Steven E. Phillips*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Aslean Z. Eaglin, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.