**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 8, 2018**

# In the Court of Appeals of Georgia

A17A1422. MAY v. S.E. GA. FORD, INC.

MCMILLIAN, Judge.

Jerry May appeals[1] the trial court's grant of summary judgment to his former employer, S.E. GA Ford, Inc. d/b/a Lilliston Ford of Kingsland ("Lilliston"), on May's claims for breach of his employment contract, unpaid commissions, and attorney fees and litigation costs, as well as on Lilliston's counterclaim seeking to recover what it contends were overpayments in compensation to May. Because we

---

[1] We note that neither of the parties' appellate briefs complies with the requirement under Court of Appeals Rule 25 (a) that "[r]ecord and transcript citations shall be to the volume or part of the record or transcript and the *page numbers* that appear *on the appellate record* or transcript as sent from the trial court." (Emphasis supplied.) The record in this case is electronically filed, making citation to the appellate record all the easier, yet the parties improperly cite to the trial court record, using only descriptors of the documents filed therein. We take this opportunity to remind counsel that the Court's briefing requirements "are not merely an inconvenience or grounds for refusing to consider a party's contentions," *Salazar v. State*, 256 Ga. App. 50, 50 (567 SE2d 706) (2002). Rather, briefs that fail to provide proper citations can hinder this Court's consideration of the parties' arguments on appeal. Id.

find that genuine issues of material fact remain as to the claims in this case, we reverse.

"A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *St. Joseph's Hosp. of Atlanta, Inc. v. Hall*, __ Ga. App. __ (806 SE2d 669) (2017). Viewed in that light, the record shows that Lilliston hired May as the dealership's general sales manager with a start date of December 11, 2012, and over seven months later, the parties executed a document entitled "General Sales Manager Payment Plan," which provided that May was entitled to a "Draw against Commission" of $6,000 per month (the "Contract"). The remainder of the Contract provided in its entirety:

> 5.5 % Commission of total Gross - Front & Back minus wholesale losses, F&I Chargebacks & policy (New/Used)
>
> If CSI is below Region Standards Percentage of Gross is 4.5%. (1.0% penalty)

May avers that in late October 2014, the parties reached an oral agreement to change the terms of his compensation to a guaranteed monthly salary of $8,000.00, plus a 5.5% commission, but Lilliston failed to memorialize this agreement in a

2

written contract.[2] Although Lilliston does not dispute that May's compensation was changed at that time, Jedon Lilliston, Lilliston's president, states the parties agreed only to increase May's monthly draw against commissions to $8,000. The record reflects that the parties' Contract was altered on or about November 3, 2014 by striking the $6,000 draw amount and writing $8,000 in its place. However, only Lilliston signed off on this alteration. May did not sign off on the change and asserts that he was unaware that the Contract had been altered. Approximately three months later, on January 31, 2015, Lilliston terminated May's employment citing "[f]ailure to perform at the managerial position level" on his separation notice, although May says that he was simply told that the dealership wanted to go in a new direction. May asserts that Lilliston did not pay him his guaranteed $8,000 salary, from November 2014 through January 2015 and still owed him commissions.

[2] Although on appeal, Lilliston attacks May's affidavit as "an unsupported, unsubstantiated, uncorroborated self-serving statement," the record does not reflect that it raised any objection to the affidavit in the trial court below; therefore, any such objections are waived. "[O]bjections to affidavits . . . will not be entertained for the first time on appeal where such affidavits were considered by the trial judge, without objection, in ruling on motions for summary judgment." (Citation and punctuation omitted.) *Shuford v. Aames Plumbing & Heating, Inc.*, 327 Ga. App. 844, 847 (1) (761 SE2d 395) (2014).

May filed suit seeking to recover these unpaid amounts, and Lilliston counterclaimed to recover amounts it asserts it overpaid May. Lilliston subsequently moved for summary judgment on May's claims and its own counterclaim, and the trial court granted that motion, ruling in favor of Lilliston on May's claims and awarding the company $19,085.27 in overpaid draws on its counterclaim. May contends on appeal that the trial court erred in granting summary judgment to Lilliston because genuine issues of material fact exist as to the terms of the new compensation agreement the parties negotiated in late 2014. We agree.

1. Our review of the record reveals that a genuine issue of material fact exists as to whether the parties agreed in late 2014 that May would receive a guaranteed monthly salary of $8,000, plus a commission, or merely an increased monthly draw against commissions as each party has submitted affidavits supporting their relative positions. The Contract does not resolve this issue because May did not sign off on the handwritten alteration to the draw amount and states he was unaware of the altered agreement. Additionally, although Lilliston presented records showing that it treated the $8,000 monthly payment to May as a draw and not as salary, May averred that he never received his $8,000 monthly salary payments for November 2014 through January 2015, and instead he only received commissions, and May

4

questioned the shortfall by email soon after his termination. Therefore, we find that the evidence raises issues of material fact regarding the terms of the amended contract, and the trial court erred in granting summary judgment to Lilliston on May's claims.

2. Additionally, we find that genuine issues of material fact exist as to Lilliston's counterclaim because the parties' Contract and the evidence of record do not establish Lilliston's right to recover the amounts sought as a matter of law. Lilliston asserted counterclaims for breach of contract and unjust enrichment,[3] and Lilliston seeks to recover two elements of damages: (1) overpayment of monthly draws for three months where the amount of the draw exceeded the commissions May earned for the month and (2) overpayment of 1% in commissions during the months of April 2014 to January 2015 when, according to Jedon Lilliston, gross sales did not meet the requirements of the Contract.

a. *Draw/commission shortfalls* – Lilliston asserts that it is entitled under the Contract for reimbursement of the amount of draw payments it made to May in excess of commissions he earned. We find, however, that the Contract language is

---

[3] Lilliston also asserted a counterclaim for conversion, but the trial court denied summary judgment on that claim and Lilliston does not appeal this ruling.

5

ambiguous, containing numerous undefined terms and abbreviations apparently used in the car sales industry. Under the rules of contract construction,

> words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. Ambiguities in terms used in written contracts, and their meanings as understood in the trade and by the contracting parties, may be explained by parol proof of this trade usage and custom. Parol evidence is admissible to explain the meaning of technical terms employed in written contracts.

(Citation and punctuation omitted.) *Southland Dev. Corp. v. Battle*, 272 Ga. App. 211, 214 (612 SE2d 12) (2005). Lilliston provided parol evidence regarding the meaning of only one of the industry terms used in the Contract: "Draw against commissions." Jedon Lilliston defined the term as "a commonly understood pay structure [in] which an employee is prepaid or advanced money to be deducted from future earned commissions."[4] He explained that it

> is an industry standard to alleviate the cash flow concerns sales representatives encounter. The dealership pays a set bi-weekly stream of income, otherwise known as a draw, and at the end of the month, the draws are deducted from the monthly commission earned and a check is

---

[4] Lilliston's comptroller provided the same description of the term.

6

written for the balance, if there is any. This help[s] the sales representative whose pay may otherwise be sporadic or unpredictable.

May does not contest this definition of the term. Accordingly, we find that the Contract as originally drafted and signed by the parties provided for a draw against commissions, entitling May to a steady $6,000 per month, plus any earned commissions in excess of that amount. This interpretation is also supported by Lilliston's pay/commission summaries ("pay summaries") for May, which show that the draw was netted against May's total commission to determine the differential amount owed him each month.

However, the Contract is silent with regard to the parties' relative obligations in the event the commissions failed to cover May's draw for the month, as it did during three months of May's tenure at Lillilston – September 2014, October 2014, and January 2015. The explanation of the term "draw against commissions" provided by Lilliston does not address such a situation, nor does Lilliston provide parol evidence showing that industry standards place an obligation on the part of the sales representative to repay any such shortages under a draw against commission payment plan. See OCGA § 13-2-2 (3) ("The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became,

7

by implication, a part of the contract."); *Dorsey v. Clements*, 202 Ga. 820, 821-22 (44 SE2d 783) (1947) (same).

The pay summaries also fail to demonstrate any agreement or practice requiring May to reimburse Lilliston for any shortfalls between his earned commissions and draws. To the contrary, for the month of September 2014, the pay summary shows that May's commissions fell $444.62 short of covering his $6,000 draw, but nevertheless Jedon Lilliston apparently approved a $1,500 commission for May that month. The pay summary contains no indication that this commission was netted against the shortfall amount. Another shortfall, in the amount of $808.99, occurred the next month, and the pay summary merely shows that May was due $0 in additional commissions, without reflecting any negative balance. Although the pay summary for the third and final shortfall month, January 2015, shows a negative balance of $2,461.94, it also reflects that Lilliston was paid a $700 volume bonus that month, with no indication that Lilliston withheld that bonus to net against the shortfall. Therefore, questions remain as to whether May had any obligation to repay these shortfalls or whether, instead, the parties contemplated that the draw would be used merely to determine the amount of his paid commissions in excess of his draw, without any requirement that he reimburse any shortfalls.

8

Likewise, jury issues remain as to Lilliston's equitable claim for unjust enrichment. "The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." (Citation and punctuation omitted.) *Smith Svc. Oil Co. v. Parker*, 250 Ga. App. 270, 272 (549 SE2d 485) (2001). Because the parties here executed a Contract addressing May's compensation, a jury must first consider the legal issue of whether the parties had reached any contractual agreement on the recovery of shortfalls before considering any equitable unjust enrichment claim to recover such amounts.

We find, therefore, that Lilliston failed to show as a matter of law that it was entitled to recover from May the $5,215.55 in shortfalls, and the trial court erred in granting summary judgment to Lilliston on this claim.

b. *Overpaid commissions* – We reach a somewhat different conclusion on the issue of whether May was entitled to a 5.5% commission or a 4.5% commission. Jedon Lilliston testified that "now reviewing the CSI reports from April 2014 through January 2015, [i.e., after May filed suit,] . . . Jerry May[] never met or exceeded the Regional Standard and per the contract . . . was overpaid 1% for each of those months[.]" Therefore, Lilliston asserts that May should have suffered a 1%

9

commission penalty for those months under the provision of the Contract providing that "[i]f CSI is below Region Standards Percentage of Gross is 4.5%. (1.0% penalty)."[5] May, in response, does not specifically deny or present any evidence to contradict Jedon Lilliston's averments. Therefore, no genuine issue of material fact exists as to the percentage to be applied to calculate commissions from April 2014 to January 2015. However, Lilliston is not entitled to summary judgment on this counterclaim because as described in Division 2 (a), genuine issues of material fact exist as to whether Lilliston is entitled to be repaid for any shortfalls between the commission amounts and the draw.

For these reasons, we find that the trial court erred in granting summary judgment to Lilliston; therefore, we reverse the judgment and remand for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Barnes, P. J., and Mercier, J., concur.*

---

[5] Although the parties do not define "CSI," that term apparently refers to Lilliston's scores for customer service as reflected by Customer Service Index surveys. See *Superior Pontiac Buick GMC v. Nissan North America*, 2012 U.S. Dist. LEXIS 44908, at *42 (E.D. Mich. 2012).