303 Ga. 635
FINAL COPY

S18A0331. NORMAN v. THE STATE.

BLACKWELL, Justice.

Karon Norman was tried by a Liberty County jury and convicted of murder and possession of a firearm during the commission of a crime in connection with the fatal shooting of Keith Williams.[1] Norman raises three claims on appeal. First, he claims that he was denied the effective assistance of counsel when his lawyer entered a stipulation at trial about his 1993 juvenile adjudication for murder. Second, Norman contends that the trial court gave erroneous limiting instructions to the jury concerning the evidence of the 1993

---

[1] Williams was killed on October 14, 1997. On September 23, 1998, a Liberty County grand jury indicted Norman and three others — Lewis Johnson, Terrance Nesbitt, and Michael Napper — for malice murder, armed robbery, and possession of a firearm during the commission of a crime. Norman was tried alone in June 1999. (After Norman's trial, the State nolle prossed the charges against his three co-defendants.) Although the indictment charged malice murder, the trial court also instructed the jury on felony murder, and the verdict form contained an option for felony murder. The jury found Norman guilty of felony murder (not malice murder) and the other charged crimes. He was sentenced to life imprisonment for felony murder and a consecutive two-year term for firearm possession. The armed robbery count merged with felony murder. Norman moved for a new trial on January 13, 2000, and he amended the motion on December 2, 2016. The trial court denied the motion on August 14, 2017. Norman filed a timely notice of appeal on September 5, 2017, and this case was docketed to the term of this Court beginning in December 2017.

murder. Finally, he asserts that his due process rights were violated by the 17-year delay in his post-conviction proceedings. Finding no reversible error, we affirm.

1. On October 14, 1997, police officers responded to reports of a shooting at the Lakeside mobile home park in Liberty County. There, they found a man later identified as Williams lying on the ground with a bullet wound to the back of the head. After an investigation, Norman and three other high-school age boys — Michael Napper, Terrance Nesbitt, and Lewis Johnson — were charged in connection with Williams's death. Norman was tried alone, however, and the other three co-defendants, being the only eyewitnesses to the murder, testified against him. Viewed in the light most favorable to the verdict, their testimony shows the following.

On the day in question, after school, Norman and Napper bought some shoes and went to Nesbitt's home in Lakeside. There, Norman took a "black gun" from his waist and passed it around for Napper and Nesbitt to see. All three then headed over to the mobile home park laundromat, where they met up with Johnson. Some time later, as it was getting dark, a red Camaro pulled up near the laundromat, with Williams in the passenger seat. Norman, Nesbitt, and

2

Johnson approached Williams and talked to him about buying drugs. Williams showed them a plastic bag with powder cocaine and two blue baggies of crack cocaine. No purchase was made at the time, however, so Williams got back in the car and drove off.

Norman, Napper, Nesbitt, and Johnson then walked back toward Nesbitt's home. They stopped when they saw the red Camaro parked near one of the mobile homes. Williams came out of the mobile home and continued the conversation with Norman about buying drugs. Apparently, Williams wanted a higher price than Norman was willing to pay. As negotiations began to break down, Norman pulled out a gun and shot Williams in the back of the head. After the shooting, Norman and the others ran to Napper's home, where Norman divided the drugs among the four of them. Norman and Johnson then left by taxi. During a subsequent search of Norman's residence, the police found a blue baggie with crack cocaine in his room. The gun was never recovered.

Norman testified in his own defense and laid the blame for the killing on Johnson. According to Norman, when he and the others were at the laundromat, he (Norman) bought some drugs from the driver of the red Camaro. Later, when Norman and the others came to Williams's mobile home, it was Johnson who

again started negotiating with Williams for a sale of drugs. Williams handed some drugs to Johnson and told him to hurry up and make a decision. A few minutes later, Norman testified, Williams turned to walk toward his car, and "that's when we heard the gunshot." Norman asserted that Johnson, not him, held the gun at the time the shot was fired. And when the group came to Napper's house after the shooting, it was Johnson who divided up the drugs. Norman could not say what happened to the gun — he testified that he never possessed it.

Norman does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Norman was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Norman argues that his trial lawyer rendered ineffective assistance when he entered into a stipulation about a 1993 murder for which Norman had

4

been adjudicated delinquent as a juvenile. Before trial, the State filed a motion to present evidence of a "similar transaction," namely, that Norman "committed the offense of murder in that he . . . did shoot and kill Jerome King with a pistol" in Savannah in 1993, and that Norman "was treated as a juvenile offender . . . and was placed on probation/supervision by the juvenile court." The trial court held a hearing on the State's motion, during which the prosecution produced a copy of the juvenile court felony adjudication and also introduced the testimony of a detective who had investigated the 1993 shooting. This evidence showed that, on October 26, 1993, Norman was watching a neighborhood stickball game when two young men approached him from different directions, holding their hands in their pockets. One of the men told Norman not to run, at which point Norman shot him in the chest, killing him. According to the juvenile court order, there was "evidence that drug dealing between the two boys was involved in their dispute" and that "there were other incidents of violence involving the two." Norman's counsel opposed the admission of this evidence, arguing that it was substantially more prejudicial than probative and not sufficiently similar to the killing of Williams to be admissible.

5

After the hearing, the trial court reserved its ruling pending the resolution of other issues. Shortly before trial, the trial court granted the State's motion, ruling that the 1993 murder evidence was admissible "to show intent, course of conduct and state of mind and motive of the defendant," and that the court would "give an instruction to the jury concerning the limited purpose to which the evidence is offered." That same day, the prosecution filed a list of more than ten witnesses from Savannah who would testify about the 1993 shooting.

At trial, toward the end of the State's case-in-chief, the prosecuting attorney informed the court that he had talked to Norman's lawyer about stipulating to "the testimony of the juveniles who observed the [1993] shooting . . . for the purpose of us not producing these witnesses," and that Norman's attorney was "willing to stipulate as to what the witnesses would testify to as to how the shooting occurred." Norman's lawyer agreed. The trial court then charged the jury on the limited purposes for which they could consider the 1993 murder evidence, and the prosecutor announced the following stipulation to the jury:

> Ladies and gentlemen of the jury, what we have is a stipulation as to what some witnesses will testify to if they were here before you. The stipulation is . . . on this particular incident

that there were a lot of kids gathered around watching a stickball game. Among those who would testify would be [naming six witnesses].

Those boys would testify that they were there at the stickball game and they observed the victim, Jerome Steve King, and his running buddy, Antonio Smalls, approach [Norman] from opposite sides of the street, that as they approached the defendant they had their hands sort of under their arm like this and that certain people assumed that those two gentlemen were armed. And as they approached [Norman] and got within about six to eight feet, that [Norman] pulled out a gun and shot [King] in the chest and he died of his injury. That's what our stipulation is. In lieu of putting up the evidence itself, [Norman] and his attorney are agreeing that that's what the testimony would be.

The State further called a detective to testify about his investigation of the 1993 murder. Among other things, the detective read to the jury a transcript of the interview he conducted with Norman at the time, in which Norman essentially confessed to the shooting.

On appeal, Norman contends that his trial lawyer rendered ineffective assistance when he "stipulated to the admissibility" of the 1993 murder evidence.[2] Norman asserts that the 1993 murder evidence was crucial to the

---

[2] To obtain relief based on ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that this deficient performance prejudiced the defense. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, a defendant must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Jessie v. State, 294 Ga. 375,

State's theory of the case (that Norman, not Johnson, shot Williams), and he points out that the prosecution heavily emphasized the 1993 murder in its closing argument. But the record, as described above, shows that trial counsel never stipulated to the *admissibility* of this evidence; in fact, trial counsel opposed the State's motion to admit this evidence, and the trial court ruled against the defense on this issue. What trial counsel did was stipulate to the substance of the eyewitness testimony surrounding the 1993 murder — testimony that the State planned to introduce through several juvenile witnesses. And the essential facts revealed in that testimony were introduced anyway through the testimony of the investigating detective. So the only thing that counsel's stipulation accomplished was to have fewer witnesses describe the 1993 shooting to the jury. Evidence of this shooting would have come in regardless of the stipulation, given the trial court's ruling that it was admissible, and given the State's readiness to present this evidence. In light of these circumstances, trial counsel's stipulation was eminently reasonable and could

377 (2) (754 SE2d 46) (2014) (citation and punctuation omitted)). To show prejudice, a defendant must show "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009) (citation and punctuation omitted).

not have had any detrimental effect on the outcome of Norman's trial, which means that Norman's ineffective assistance claim fails. See <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

3. To the extent Norman argues that the trial court erred when it admitted the 1993 murder evidence, this claim fails also. "We review a trial court's evidentiary rulings under an abuse of discretion standard of review." <u>Reed v. State</u>, 291 Ga. 10, 14 (3) (727 SE2d 112) (2012) (citation and punctuation omitted). Norman was tried in 1999, long before Georgia's new Evidence Code came into effect on January 1, 2013. Under the old Evidence Code, evidence of other acts or wrongs — what we then called "similar transaction" evidence — was not admissible *solely* for the purpose of showing "that the defendant committed the crime on trial because he has a criminal character," <u>Peoples v. State</u>, 295 Ga. 44, 53 (4) (b) (757 SE2d 646) (2014) (citation and punctuation omitted), but such evidence was admissible for a broad range of other purposes, including to show "knowledge, common design, modus operandi, motive, intent, good or bad faith, bent of mind, plan, scheme, course of conduct, identity, or other matters dependent upon a person's state of mind," <u>Lowery v. State</u>, 282 Ga. 68, 70-71 (3) (646 SE2d 67) (2007) (citation and punctuation omitted). See

9

also <u>Farley v. State</u>, 265 Ga. 622, 623 (2) (458 SE2d 643) (1995) ("[R]elevant 'other transactions' evidence is admissible notwithstanding its tendency to discredit the character of the defendant.").[3]

For similar transaction evidence to be admitted, the State had to make three affirmative showings: (1) that this evidence was introduced "not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) that there was "sufficient evidence to establish that the accused committed the independent offense or act"; and (3) that there was "a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter." <u>Williams v. State</u>, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). See also <u>Farley</u>, 265 Ga. at 623 (2) ("Proof of crimes which are similar or are closely connected to the crime charged *does* tend to establish the crime charged." (citation and

---

[3] At the time of Norman's trial, the relevant Code section was OCGA § 24-2-2, which provided: "The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." OCGA § 24-2-2 (repealed effective January 1, 2013).

punctuation omitted; emphasis in original)). We "will not disturb the findings of the trial court on the issue of similarity or connection of similar transaction evidence unless they are clearly erroneous." Reed, 291 Ga. at 14 (3) (citation and punctuation omitted).

In this case, the first two prongs were easily satisfied — the State expressly sought to introduce evidence of the 1993 murder for an appropriate purpose, and there was no question that Norman committed the murder. The third prong presents a somewhat closer issue, but in the end, we cannot say that the trial court clearly erred in determining that the 1993 conduct was sufficiently similar to the killing of Williams. In both instances, Norman used a gun to shoot someone in the presence of his peers, he did so with little provocation, and he had engaged in drug transactions with the victim. See Abdullah v. State, 284 Ga. 399, 401 (3) (667 SE2d 584) (2008) ("[A] transaction does not have to mirror every detail in order to authorize its admission; rather, the proper focus is upon the similarities between the incidents and not upon the differences." (citation and punctuation omitted)).

Our cases under the old Evidence Code found similar transaction evidence to be admissible in comparable situations. See, e.g., Farley, 265 Ga. at 623 (2)

11

(evidence of prior aggravated assault admissible in murder case where, in both instances, defendant initiated an unprovoked attack on the victim, subdued the victim, inflicted serious injuries by beating and kicking victim in the head, and boasted about his acts); Starks v. State, 262 Ga. 244, 245 (2) (416 SE2d 520) (1992) (prior conduct was sufficiently similar to charged crime where both involved the defendant firing on men who were present unlawfully on his premises); Edwards v. State, 261 Ga. 509, 509 (1) n.2 (406 SE2d 79) (1991) (evidence of prior act admissible where "both crimes illustrated [defendant's] propensity to use firearms to avenge himself against someone who he thought had wronged him, and to furnish offensive weapons to others"); Haywood v. State, 256 Ga. 694, 696 (2) (353 SE2d 184) (1987) (sufficient similarity existed where both crimes involved defendant firing a weapon while intoxicated); Sport v. State, 253 Ga. 689, 690 (1) (324 SE2d 184) (1985) (prior act evidence showing that defendant shot another person the day before the murder with a similar weapon was admissible to show "bent of mind and propensity for use of a pistol"). Accordingly, the trial court did not abuse its discretion in ruling that evidence of the1993 murder was admissible.

4. As mentioned above, before the State introduced the 1993 murder evidence, the trial court gave a limiting instruction to the jury on the proper use of this evidence. Norman argues that this instruction was erroneous because it was vague and essentially allowed the jury to use the 1993 murder evidence for improper purposes. We need not review the merits of this claim, however, because Norman never objected to this instruction and thereby waived any appellate review of this claim. See Spear v. State, 270 Ga. 628, 631 (5) (513 SE2d 489) (1999) ("[R]eview of jury charges was waived by failure to object or to reserve objections."); Bryant v. State, 268 Ga. 33, 33 (1) (485 SE2d 763) (1997) (defendant waived his objections to a jury instruction "by failing either to object to that portion of the charge or to reserve objections to the charge," thereby precluding appellate review); Woods v. State, 263 Ga. 804, 804 (2) (440 SE2d 1) (1994) ("[A]ppellant waived his right to object to these jury charges on appeal by failing to object or reserve his right to object to the charges at trial.").[4]

_____

[4] Currently, OCGA § 17-8-58 (b) allows limited review for plain error when a defendant fails to object to jury instructions. But that statute became effective only on July 1, 2007, and this Court has declined to conduct plain error review of waived jury instruction errors where the trial occurred before that time. See Brown v. State, 291 Ga. 750, 754 (4) (733 SE2d 300) (2012) (plain error review under OCGA § 17-8-58 was unavailable to defendant because his trial occurred before July 1, 2007). See also Ga. L. 2007, p. 597, § 5 ("This Act . . . shall apply to all trials which occur on or after July 1, 2007."). Because

13

5. Norman argues that his due process rights were violated because more than 17 years passed between the filing of his original motion for new trial and the order denying his amended motion for new trial. While we agree that long post-conviction delays such as this one are unacceptable, see Owens v. State, 303 Ga. 254, 258 (4) (811 SE2d 420) (2018),[5] the delay in this case is no reason to reverse Norman's convictions. In assessing a due process claim premised on a post-conviction delay, we generally look at four factors: "the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Glover v. State, 291 Ga. 152, 154 (3) (728 SE2d 221) (2012) (citing Barker v. Wingo, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972); other citations and punctuation omitted). But where prejudice is clearly lacking, we will not reverse a conviction, even if the other factors favor the

Norman's trial occurred in 1999, we will not conduct a plain error review of his jury instruction claim.

[5] In Owens, we discussed the widespread problem of long post-conviction delays, observing that "even if long-delayed appeals rarely result in outright reversals of convictions or only retrials or resentencings, these extended and unjustified delays in resolving criminal cases make our State's criminal justice system appear unfair and grossly inefficient." Owens, 303 Ga. at 259 (4). See also Shank v. State, 290 Ga. 844, 849 (725 SE2d 246) (2012). To address this problem, we have directed the Council of Superior Court Judges of Georgia to submit a proposed Uniform Rule of Superior Court no later than September 17, 2018. Owens, 303 Ga. at 260.

defendant. See Veal v. State, 301 Ga. 161, 167 (3) (800 SE2d 325) (2017) ("[W]e have repeatedly found that the failure to make [a showing of prejudice] in an appellate delay claim [is] fatal to the claim, even when the other three factors weigh in the appellant's favor."). See also Loadholt v. State, 286 Ga. 402, 406 (4) (687 SE2d 824) (2010).

"The prejudice necessary to establish a due process violation based on post-conviction direct appeal delay is prejudice to the ability of the defendant to assert his arguments on appeal." Loadholt, 286 Ga. at 406 (4) (citation and punctuation omitted). As with claims of ineffective assistance of counsel, "appellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different." Chatman v. Mancill, 280 Ga. 253, 260-261 (2) (e) (626 SE2d 102) (2006) (citation and punctuation omitted). In this case, Norman failed to show that his post-conviction delay prejudiced him. As discussed above, his claims on appeal do not warrant reversal of his convictions, and he fails to demonstrate how the passage of time negatively affected these claims; our decision would have been the same regardless of when he had brought his appeal. Because no reasonable probability exists that Norman would have prevailed on appeal but for the delay,

he cannot establish a due process violation, and the trial court did not abuse its discretion in denying relief on this ground. See <u>Veal</u>, 301 Ga. at 167 (3) (post-conviction delay of 17 years did not violate defendant's due process rights, as no prejudice was shown); <u>Payne v. State</u>, 289 Ga. 691, 695 (2) (b) (715 SE2d 104) (2011) (15-year delay did not violate due process).

<u>Judgment affirmed. All the Justices concur</u>.

Decided May 7, 2018.

Murder. Liberty Superior Court. Before Judge Stewart.

Rouse & Copeland, Amy L. Copeland, for appellant.

Tom Durden, District Attorney, Brooklyn R. Franklin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.