307 Ga. 625
FINAL COPY

S19A1187.  DAVIS v. THE STATE.

WARREN, Justice.

Carlton Davis was convicted of felony murder in connection with the death of Lakeitha Sims.[1]  On appeal, Davis argues that the trial court erred by admitting a statement he made to a detective that Davis contends he did not freely and voluntarily make; that the trial court erred by improperly admitting into evidence a letter that Davis contends violated his reasonable expectation of privacy under the Fourth Amendment; and that his due process rights were violated because of the 14-year delay between Davis's jury verdict and the trial court's denial of his motion for new trial.  For the

---

[1]  On February 6, 2004, a Liberty County grand jury indicted Davis for malice murder and felony murder predicated on the aggravated assault of Sims.  After a trial held from September 29 to 30, 2004, a jury found Davis guilty of felony murder, and the trial court sentenced Davis to life imprisonment on the same day.  Davis filed a motion for new trial on October 5, 2004, and amended it twice through new counsel.  After a February 26, 2018, hearing on the motion, the trial court denied Davis's amended motion for new trial on September 18, 2018.  Davis timely filed a notice of appeal on October 3, 2018, and the case was docketed in this Court for the August 2019 term and submitted for a decision on the briefs.

reasons that follow, we disagree and affirm the trial court's denial of Davis's motion for new trial.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at Davis's trial showed that on the evening of August 16, 2003, Davis was at Sims's mobile home with Sims and Emanuel Tillman. Davis and Tillman were living with Sims, and Davis and Sims were involved in a romantic relationship.

On the evening of August 16, Davis and Sims "got into an argument over how the furniture was moved around" in the living room. At some point after the argument, Davis and Tillman went to a gas station to buy "a few beers." After returning from the gas station, both men began drinking and smoking marijuana in a car outside of Sims's home. When "it was starting to get dark out," Davis went inside. Tillman stayed in the car "listening to music" and "drinking" and eventually fell asleep.

At some point later that night, Davis came back outside, woke Tillman up, and said that "someone was coming looking for" them. Davis was "in a rush," and he and Tillman went inside, packed their

2

bags, and drove to the nearby mobile home of Lisette Rodriquez around 2:00 or 3:00 a.m.[2]   When Davis and Tillman entered Rodriquez's home, Rodriquez was not there but two other people were.  Tillman "looked like he [had seen] a ghost," and Davis "was acting . . . edgy" and "pacing the floor back and forth."  Davis said that he and Tillman had gotten into an argument at a nightclub in Savannah a few weeks prior with a man called "TKO" and that TKO was now coming after Davis and Tillman.[3]  Davis said that he and Tillman were fleeing to Chicago, where Davis was originally from, and that he needed to get in touch with Rodriquez in order to retrieve some money she owed him for a television he gave to her. After talking to Rodriquez by phone, Davis left to pick up Rodriquez from a Holiday Inn, where she was with a friend after work, and Rodriquez gave Davis the money he requested and filled his car with

---

[2] While Davis was still living with and in a relationship with Sims, Davis was also in a romantic relationship with Rodriquez starting in March or April 2003.

[3] Tillman testified at trial that during this incident in Savannah, TKO threatened to kill Davis and Tillman, claimed to know where Davis and Tillman lived, and "brandished a weapon" at Davis and Tillman.

gas. Tillman stayed behind at Rodriquez's house. At this point, it was "[c]lose to 4:00 or 5:00 in the morning, still dark." Davis told Rodriquez that there were men "chasing" him and Tillman before he left to pick up Tillman from Rodriquez's home. Davis and Tillman then drove to Chicago, arriving around 9:00 or 10:00 that evening.

Later that morning, Sims's mother, Delores, called Sims after not receiving a call from her daughter. Sims and her mother were close and talked on the phone every day, and Sims had made plans to bring her three-month-old daughter to visit Delores that weekend. Delores grew concerned when her repeated calls to Sims went unanswered. Finally, after a day and a half of unanswered phone calls, Delores decided to drive to Sims's home to check on her daughter, bringing her nephew along with her. When they arrived at Sims's home, they saw Sims's car in the yard and Sims's pocketbook in the front seat of her car. After unsuccessfully calling for Sims and knocking on her door, Delores called the police. A police officer came by the house but eventually left. Finally, Delores's nephew was able to enter the house through a back window and let

4

Delores in the home. Inside, Delores found Sims's daughter on the bedroom floor crying, and Delores's nephew found Sims's body in the bathroom "laying over the tub." They called the police, and the paramedics and police arrived on the scene shortly thereafter.

Davis was arrested on September 13, 2003, and eventually indicted for malice murder and felony murder. At trial, the paramedic who responded to the scene testified that he found Sims's body in the bathroom. Sims was "knelt down, bent over into the bathtub" and had "obvious rigor mortis," meaning that "she had been dead for a while in order for her body to be stiff."

The detective, who was the primary investigator on the case, testified that Sims was "laying across the bathtub with her head into the bathtub laying down." He also testified that he noticed "some blood" "down by her face" when he "looked into the bathtub." Although there were no signs of struggle elsewhere in the house, the detective sealed the crime scene.

The medical examiner testified that Sims had abrasions on the back of her left shoulder, her knees, and the top of the foot at her

5

ankle. Although the medical examiner testified that there were no "significant areas of abrasion" or "remarkable external injuries" to Sims's neck area, Sims did suffer internal neck injuries, multiple abrasions to her face and lips, a "large area of hemorrhage" in both eyes, and a "bloody-mucussy discharge coming from the nose." The medical examiner ultimately concluded that Sims "died as a result of manual strangulation with multiple perimortem blunt force [injuries]" and that her manner of death was homicide.

At trial, Davis testified in his own defense. He testified that on the evening of August 16, he and Sims were arguing because he was planning to leave because TKO was after him and "the relationship wasn't working really to a point." He remembered arguing but could not remember how the argument "escalated" or what "exactly . . . happened." He denied ever meaning to harm or kill Sims that night and said he "never meant for anything — nothing like this to happen."

Davis does not challenge the sufficiency of the evidence. Nevertheless, consistent with this Court's practice in murder cases,

we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Davis was guilty of the crime for which he was convicted.  See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2.  Davis contends that the trial court erred by admitting into evidence the second statement Davis made to a detective because that statement was not freely and voluntarily made.  We disagree.[4]

During the course of the investigation into Sims's death,

---

[4] In his brief on appeal, Davis also appears to make an argument that his second statement to law enforcement was inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).  To the extent that Davis argues that his statement was inadmissible because Davis was in custody and his *Miranda* warnings were not administered again before Davis's second interview, we conclude that the trial court did not err when it ruled that Davis "was not in custody" when he gave his statements to the detective.  See *Teasley v. State*, 293 Ga. 758, 761-762 (749 SE2d 710) (2013) ("Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary [and in] reviewing a ruling on the admissibility of a defendant's statements . . . we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous." (citation and punctuation omitted.)).  See also, e.g., *Rhynes v. State*, 306 Ga. 412, 415-416 (831 SE2d 831) (2019); *DeVaughn v. State*, 296 Ga. 475, 479-480 (769 SE2d 70) (2015); *Leslie v. State*, 292 Ga. 368, 372 (738 SE2d 42) (2013).

Hinesville Police Department Detective Tracy Howard and another detective traveled to Chicago to locate and interview Davis and Tillman. On September 13, 2003, with the assistance of local police, Detective Howard located the men in Matteson, Illinois, a Chicago suburb. Detective Howard asked Davis if "he would agree to go" with him to talk about "this particular investigation" at the Country Club Hills police department. Davis agreed and followed the detectives in his own vehicle. The detectives asked that "Tillman, if he would agree to it, ride with [the detectives] in [their] vehicle just to prevent any conversation between . . . Tillman and . . . Davis regarding any type of questioning that . . . may occur." Davis was not under arrest at this time and charges were not pending against him.

Detective Howard then interviewed Davis in an interview room at the Country Club Hills police department. The room was "boxed in shape" with a table "against the wall and pretty much . . . in the middle of [the] room." Davis and Detective Howard were sitting at the table, with Detective Howard seated on the side closest to the

8

door. Prior to interviewing Davis, Detective Howard advised Davis that he was not in custody and also advised Davis of the *Miranda*[5] warnings. Davis indicated that he understood his rights, initialed and signed the waiver form, and agreed to speak with Detective Howard. After Davis and Detective Howard talked for a "little while," Detective Howard started recording audio of Davis's statement, which was approximately 13 minutes long and ended at 3:03 a.m.

Davis then "indicated he wanted to make an additional statement," which began at 4:02 a.m., 59 minutes after the conclusion of his first statement. In that 59-minute interval between recorded interviews, Davis and Detective Howard took at least one smoke break and the two continued to talk; they discussed baseball, talked about the Chicago area, and Detective Howard told Davis that he did not believe Davis was telling the truth. Before Davis gave his second recorded statement, Detective Howard "reassured on the tape that [Davis] understood [that] . . . his rights

---

[5] *Miranda*, 384 U.S. at 479.

9

were still in place" and "[t]hat [Davis] didn't have to talk to [Howard] if he didn't choose to and to [e]nsure that the tape was being freely and voluntarily given."

"To determine whether a confession was voluntarily made, a trial court must consider the totality of the circumstances, and unless clearly erroneous, a trial court's credibility determinations and factual findings relating to the admissibility of a confession must be upheld on appeal." *Turner v. State*, 287 Ga. 793, 794 (700 SE2d 386) (2010) (citation and punctuation omitted). "However," on appeal we "independently apply the law to the facts." Id. (citation and punctuation omitted).

During a pretrial *Jackson-Denno*[6] hearing on the admissibility of the second recorded statement, the trial court found "by a preponderance of the evidence that [Davis] was advised of each of his *Miranda* rights"; "[t]hat he understood them"; and that he "voluntarily waived them and he then thereafter gave his statement freely and voluntarily . . . not only as to the initial statement but as

---

[6] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

10

to the second statement also."

Here, the evidence presented at the *Jackson-Denno* hearing showed that Davis voluntarily agreed to go to the police station for questioning; drove to the station in his own car; was told he was not in custody and did not have to talk to law enforcement; and initiated his second statement to the detective. The evidence also showed that Davis was able to read and write, was educated, had additional education through the military, and appeared to understand his *Miranda* rights. Moreover, no evidence was presented that Davis was ever restrained, was told he was not free to leave, or was under the influence of any alcohol or drugs. See, e.g., *Hopwood v. State*, 307 Ga. __ (835 SE2d 627) (2019) (affirming that the trial court did not err by admitting the defendant's statements to an investigator where the defendant "did not appear to be intoxicated or otherwise unable to voluntarily waive her rights," the record did not show the defendant suffered from "any mental incapacity at the time she made her statement," and the defendant "appeared to understand and voluntarily waive her rights"); *Turner*, 287 Ga. at 794-795

11

(affirming that the trial court did not err by admitting the defendant's statements where the defendant could read and write, was not under the influence of drugs or alcohol, was never handcuffed, was free to leave at any time, and voluntarily accompanied the interrogating officers to the sheriff's office). Accordingly, the trial court did not err in ruling that, under the totality of the circumstances, Davis gave his statements "freely and voluntarily" and by admitting those statements at trial. See *Hopwood*, 307 Ga. at __; *Turner*, 287 Ga. at 794-795.

3. Davis argues that the trial court improperly admitted as evidence at trial a letter that Liberty County jail personnel opened, violating his reasonable expectation of privacy under the Fourth Amendment. However, because the record shows that opening the letter was for security and maintenance purposes, rather than for prosecutorial purposes, the search did not violate the Fourth Amendment, and Davis's contention fails.

On March 15, 2004, Sergeant Delores Wilson, the office manager at Liberty County jail who handles all of the incoming

12

mail, received an envelope addressed to "PFC Robert R. Thompson" at a Fort Stewart address from "Jerome Smith" with a return address from Liberty County jail. When Sergeant Wilson saw the letter, it was marked "return to sender" because it could not be delivered to the designated Fort Stewart recipient. Sergeant Wilson realized that the letter had originally been sent from the jail, as evidenced by the Liberty County jail return address and the Liberty County jail stamp on the back of the envelope — a stamp that marks every piece of outgoing mail pursuant to the jail's policy.

Sergeant Wilson then checked the jail's computer database and discovered that the jail had never housed a "Jerome Smith" as an inmate. Because she was unsure to whom she should return the letter, she opened the letter to determine its author. She then brought it to Doug Franks, the jail administrator in charge of daily jail operations. Based on the content of the letter, Franks instructed that the letter be turned over to Detective Howard.[7]

---

[7] In essence, the letter asked its intended recipient to force Tillman to confess to the murder of Sims and then to kill Tillman and make his death look

At a hearing on the admissibility of the letter, Sergeant Wilson testified that she opened the letter to "verify who actually [wrote it] since we knew it came out of the Liberty County Jail [and] we knew that it had to have been one of our inmates that had written the letter" and "to know whose file — to put [the letter] in because we don't just leave the mail — you know, there's nowhere to put this and so it has to be filed away in the proper place." She confirmed that she was "basically investigating to try and find out who to give the letter back to."

Franks testified that "[i]n all cases, . . . all mail that comes into the jail is [opened and] monitored for contraband . . . unless it's marked from an attorney." He also confirmed that, in this case, what they "essentially . . . were concerned with . . . [was] investigating inside the letter to find out who the letter actually

---

like a suicide. The letter instructed the recipient to capture this "confession" on videotape. The letter also cautioned the recipient to "[m]ake sure you got your alibis covered" and contained statements like: "Plan this out perfectly and look at all angles. They could get me for conspiracy but not unless they got hard evidence." To facilitate the plan, the letter included Tillman's cell phone number, home phone number, home address, and a map to his house. It also provided the work schedule of Tillman's mother and her husband and explained that "[n]either one of them possesses a firearm."

belonged to" and "who [they] could return it to."

As an initial matter, the trial court ruled that "under [this] set of circumstances [Davis] was a [pretrial] detainee" because "[h]e had not been convicted of a crime" when the letter was opened by Liberty County jail personnel. It further concluded that "any expectation of privacy by this defendant, if he in fact did mail this letter, was waived when he put somebody else's name on the address," and that, "as a security and administrative process of the jail," jail personnel "had a right to open the letter to determine who it should be returned to." As a result, it ruled that "the letter [was] admissible providing there's some testimony that would tie it to this defendant." At trial, Rodriquez testified that she recognized the letter's handwriting as belonging to Davis, and the letter was admitted over objection.

"A pre-trial detainee's Fourth Amendment expectation of privacy in his cell and personal effects 'is necessarily diminished.'" *Leslie v. State*, 301 Ga. 882, 887 (804 SE2d 351) (2017) (quoting *Thomas v. State*, 263 Ga. 85, 87 (428 SE2d 564) (1993)); see

15

*Armstead v. State*, 293 Ga. 243, 246 (744 SE2d 774) (2013) ("Pretrial detainees have a substantially diminished expectation of privacy for purposes of the Fourth Amendment."). "Consequently, items found during searches conducted for security and maintenance purposes are not within the scope of protection of the Fourth Amendment." *Leslie*, 301 Ga. at 887; see also *State v. Henderson*, 271 Ga. 264, 266 (517 SE2d 61) (1999) ("[Our prior case law] thus stands for the proposition that the Fourth Amendment does not apply to a search by jail officials of a pre-trial detainee's cell for security and maintenance purposes."). "However, where a search is not initiated for legitimate prison objectives, but instead is instigated by the State for the purposes of bolstering the prosecution's case against a pre-trial detainee, then the pre-trial detainee 'retains a limited but legitimate expectation of privacy' and is protected from an unreasonable search." *Leslie*, 301 Ga. at 887 (quoting *Henderson*, 271 Ga. at 267).

Here, the record supports the trial court's ruling that the letter was recovered during a search conducted for security and

16

maintenance purposes. At the hearing on the admissibility of the letter, the State presented evidence that Sergeant Wilson opened the letter for the administrative purpose of processing the mail because she did not know to whom the letter should be routed. Indeed, even Davis admits in his appellate brief that the "jailers opened the letter . . . to determine how to file it." Moreover, Franks testified that "all mail" is opened and monitored "for contraband." There is no record evidence showing that the opening of the letter was instigated for prosecutorial purposes or "for the purposes of bolstering the prosecution's case against [Davis]."[8] See *Leslie*, 301 Ga. at 887. Compare *Henderson*, 271 Ga. at 267-268 (holding a warrant was required to search a pre-trial detainee's cell where "the evidence adduced in the case at bar establishe[d] uncontrovertedly that the sole purpose of the search of [the detainee's] cell was to further the prosecution's effort to obtain a conviction against [the

---

[8] Davis's argument that the jailers did not testify they had a particularized concern about this letter containing contraband does not amount to evidence that the jailers opened the letter for prosecutorial purposes.

pre-trial detainee]"). To the contrary, the Liberty County jail personnel did not even know the identity of the letter's author or sender when they opened the letter. And because Rodriquez testified at trial that she recognized the letter's handwriting as belonging to Davis, a sufficient connection between Davis and the letter was made for the trial court to admit the letter into evidence. Accordingly, the trial court did not err when it ruled that Davis's Fourth Amendment rights were not violated and by admitting the letter into evidence at trial.

4. Davis contends that the 14-year delay between his jury verdict and the trial court's denial of his motion for new trial violates his due process rights. We have admonished that long post-conviction delays 'put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial,' and have "'reiterate[d] that it is the duty of all those involved in the criminal justice system . . . to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay."' *Owens v. State*, 303 Ga. 254, 258 (811 SE2d

18

420) (2018) (quoting *Shank v. State*, 290 Ga. 844, 849 (725 SE2d 246) (2012)). Even so, Davis's due process claim fails here because, as explained below, he has failed to demonstrate any prejudice caused by the delay. See *Norman v. State*, 303 Ga. 635, 641-642 (814 SE2d 401) (2018); *Owens*, 303 Ga. at 258-259; *Shank*, 290 Ga. at 849.

"Substantial delays in the appellate process implicate due process rights, and we review appellate due process claims under the four-factor analysis used for speedy trial claims set forth in *Barker v. Wingo*, 407 U.S. 514 (92 SCt 2182, 33 LE2d 101) (1972)." *Veal v. State*, 301 Ga. 161, 167 (800 SE2d 325) (2017). The four *Barker* factors include the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker*, 407 U. S. at 530. "However, in determining whether an appellate delay violates due process, prejudice, unlike in the speedy trial context, is not presumed but must be shown." *Glover v. State*, 291 Ga. 152, 155 (728 SE2d 221) (2012) (citation and punctuation omitted). "'[A]ppellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the

19

appeal would have been different.'" *Norman*, 303 Ga. at 642 (citation omitted).

Davis argues that the first three *Barker* factors weigh in his favor and that he has also proven prejudice through his presentation of meritorious claims on appeal. However, even assuming that the first three *Barker* factors weigh in Davis's favor, his due process claim nevertheless fails because Davis has failed to show that he was prejudiced by the delay. See *Norman*, 303 Ga. at 642. ("But where prejudice is clearly lacking, we will not reverse a conviction, even if the other factors favor the defendant."); *Veal*, 301 Ga. at 168-169 (noting that this Court has "repeatedly found that the failure to make [a showing of prejudice] in an appellate delay claim to be fatal to the claim, even when the other three factors weigh in the appellant's favor"). Here, Davis only points to his enumerations of error on appeal as evidence that he has suffered prejudice. But considering that his enumerations are without merit — as we have concluded above — our decision would have been the same regardless of when Davis brought his appeal and thus Davis has

failed to demonstrate prejudice. See *Norman*, 303 Ga. at 642; *Loadholt v. State*, 286 Ga. 402, 406 (687 SE2d 824) (2010) ("[W]here 'the enumerations . . . raised on appeal are without merit[,] there can therefore be no prejudice in delaying a meritless appeal.'" (citation omitted)). Accordingly, Davis cannot establish a due process violation, and the trial court did not abuse its discretion in denying relief on this ground. See *Norman*, 303 Ga. at 642.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 13, 2020.
Murder. Liberty Superior Court. Before Judge Stewart.
*Rouse & Copeland, Amy L. Copeland*, for appellant.
*Tom Durden, District Attorney, Alexis M. Antonucci, Sandra Dutton, Assistant District Attorneys; Christopher M. Carr, Attorney*

21

*General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.