315 Ga. 382
FINAL COPY

S22A1202.  MITCHELL v. THE STATE.
S22A1304. DORSEY v. THE STATE.

McMillian, Justice.

In October 2016, Taiquan Mitchell and Deon Dorsey were jointly tried and found guilty of malice murder and other crimes in connection with the shooting death of Marcus Waters, Jr.[1] On

---

[1] The crimes were committed on January 7, 2014. On April 4, 2014, a DeKalb County grand jury indicted Mitchell and Dorsey for malice murder (Count 1), four counts of felony murder (Counts 2-5), aggravated assault (Count 6), first-degree burglary (Count 7), attempted armed robbery (Count 8), and attempted possession of more than one ounce of marijuana (Count 9). Mitchell and Dorsey were each separately indicted for possession of a firearm during the commission of a felony (Counts 10 and 11). At a joint jury trial held from September 26 to October 3, 2016, Mitchell and Dorsey were found guilty of all counts. The trial court sentenced each man to serve life in prison for malice murder, twenty years in prison for attempted armed robbery, ten years in prison for first-degree burglary, five years in prison for attempted marijuana possession, and five years in prison for the firearm possession count, with the sentences to run consecutively. The remaining counts were either merged for sentencing purposes or vacated by operation of law. Mitchell timely filed a motion for new trial, which he amended on June 1, 2020, through new counsel. Dorsey also timely filed a motion for new trial, which he amended on December 4, 2019, through new counsel. After a joint hearing in March 2022, the trial court granted their motions for new trial as to a merger claim with respect to merging Count 8 into Count 9 (which the State conceded) and resentenced both Mitchell and Dorsey accordingly, but denied the remainder of the motions on

appeal, Mitchell asserts that the trial court erred in denying his motion for new trial on the general grounds and in denying his motion for a mistrial after two jurors were seen being served alcoholic beverages during a lunch break. Dorsey separately asserts that the evidence was not sufficient to prove beyond a reasonable doubt the crimes for which he was convicted. We have consolidated these appeals for the purpose of issuing an opinion, and for the reasons explained below, we affirm the convictions in both cases.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed that around 1:30 a.m. on January 7, 2014, Waters's next-door neighbor, Jarvis Johnson, heard a loud "thud" nearby, followed immediately by at least ten gunshots. After the gunshots ended, Johnson called Waters to check on him. When no one answered, Johnson went outside and saw that Waters's front door was wide open. Johnson's girlfriend called 911.

DeKalb County Police Officer R. E. Carrigan was the first to

April 21, 2022. Mitchell and Dorsey timely appealed, and their cases were docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

respond to the Redan Village apartment complex, which is in unincorporated DeKalb County, and noticed that the door to apartment 131 was open. When he approached, he saw signs that the door had been kicked in — the deadbolt was still extended and both the door and doorframe had obvious damage. He also saw blood outside the doorway and streaks of blood leading from the apartment door to the parking lot. Through the open doorway, Officer Carrigan saw a shattered cell phone and shell casings on the living room floor.

Officer Carrigan and another responding officer discovered a closed bathroom door with two bullet holes. The officers gave verbal warnings for whoever was in the bathroom to come out, but there was no answer. When they tried to open the door, something heavy was leaning against it. They were able to force the door open enough to see a gun on the bathroom floor next to a person's hand. Officer Carrigan reached in and moved the gun outside the bathroom. When the officers continued pushing the door open, they discovered a nude man lying on the floor behind the door with his feet toward the

bathtub. There was a great deal of blood on the bathroom floor, and the man had no vital signs. Officers saw shell casings on the bathroom floor and noticed that the bathtub was wet, as if the victim had just taken a shower.

Avondale Estates Police Officer Ryan Long testified that at 1:51 a.m. on January 7, he observed a white Crown Victoria run a red light on Covington Highway and conducted a traffic stop of the vehicle. Officer Long had recently received information from dispatch to be on the lookout for a female driver in a white Crown Victoria who had called 911 to report that she was transporting two men who had been shot to the hospital. As he approached the vehicle on foot, he saw blood on the back bumper and a man, later identified as Dorsey, lying on the back seat with an apparent injury to his right leg and a large amount of blood on his pants. A man in the front passenger seat, later identified as Mitchell, had what appeared to be a gunshot wound to his left wrist.

Mitchell told Officer Long that they had been walking near Covington Highway and Memorial Drive when they were shot by a

passing car. Officer Long noted the odor of marijuana coming from the car and asked if the shooting happened in connection with a drug deal. Mitchell replied that he was attempting to purchase marijuana from a man he had known for a couple of weeks, and the deal "went bad." He described the shooter as a man with facial tattoos wearing a black hoodie and black pants who left the scene in a gray Chevy Impala. Officer Long requested EMS assistance, and both men were transported to a hospital. Officer Long also sent out a BOLO ("be on the lookout") for the man and car described by Mitchell.[2]

Datieria Clifton, the driver of the white Crown Victoria, testified that she grew up with Mitchell and Dorsey, the latter of whom was her cousin, and that they were all friends. After work on the night of the shooting, Datieria went to her brother's apartment on Memorial Drive. When she arrived around 11:30 p.m., Mitchell and Dorsey were hanging out with her brother, Deonte Clifton. They

---

[2] Officer Carrigan received the BOLO and spent about ten minutes looking for a gray Chevy Impala until he received the call regarding shots fired at the Redan Village apartment complex, less than two miles from where he had been patrolling.

all smoked marijuana together, except Dorsey. Later that evening, Mitchell asked Datieria to drive him and Dorsey to the Redan Village apartments so they could buy marijuana from someone they had met at a gas station.[3] Datieria — who was familiar with that apartment complex because she, Mitchell, and Dorsey knew other people who lived there — agreed and dropped them off by the laundromat building in the apartment complex before leaving to meet up with her friend. Just a few minutes later, however, Mitchell called her saying that "things went wrong" and she needed to come back. Datieria turned around and found Mitchell waiting at the same spot where she had dropped them off, but he was bleeding from his hand. She asked where Dorsey was, and Mitchell pointed to the back of the apartments. Datieria found Dorsey lying on his back in the grass behind the apartment, grunting and bleeding and pointing a gun. Datieria tried to stand him up, but Dorsey was too weak, so she dragged him by his shirt to her car, and Mitchell helped her put

---

[3] Datieria knew Waters from having previously purchased ecstasy pills from him, but she was not aware that Dorsey and Mitchell also knew Waters.

Dorsey in the back seat.

On the way to the hospital, Mitchell told her that they were buying some marijuana and "the dude tried to take their money." Datieria claimed that she first stopped at her brother's apartment so she could take some of the things out of her car to make Dorsey more comfortable. She also took a black gun from Dorsey and a silver gun from Mitchell, which she recognized as her brother's gun, and put both guns in a nightstand in Deonte's apartment. Datieria then woke up her brother, and he got into the car with them. Datieria claimed that she intentionally ran a red light "so that a cop would pull them over" and hopefully get Dorsey to a hospital faster. According to Datieria, Mitchell told her to say that he and Dorsey had just called her to pick them up after they were robbed in a drug deal by Covington Highway and Memorial Drive. Datieria also testified that when she was later questioned by police officers, she initially lied because she wanted "to clear" her brother. But when the officers confronted her and threatened to charge both her and her brother with murder, she told them the truth about what had

happened and where she had put the two guns.[4]

Deonte testified that his sister came to his apartment on the evening of the shooting and they all hung out for a while. He then went to sleep and woke up when his sister returned and told him that Dorsey and Mitchell had been shot. He followed her to the car and saw Dorsey in the back seat bleeding from his leg and Mitchell sitting in the front seat. Deonte got in the back seat and put pressure on Dorsey's wound as his sister drove. Mitchell told him to tell the police that they had been shot by the McDonald's restaurant at Covington Highway and Memorial Drive. Deonte admitted at trial that he was not truthful with the police officers at first. He acknowledged that the silver .44-caliber revolver his sister returned to his apartment was his and that sometimes Mitchell used it.

Crime scene investigators recovered a total of eight Winchester Luger +P 9mm nickel-plated cartridge casings — five from the hallway outside Waters's bathroom and three from inside the

---

[4] Datieria received a plea deal, in which she agreed to testify at trial in exchange for a two-year probated sentence for making false statements and tampering with evidence.

bathroom. They also recovered two Winchester 9mm Luger brass cartridge casings — one from the living room and one from the hallway outside the bathroom. In addition, two bullets were located on the living room floor, one in the bedroom, and one in the kitchen. The firearm removed from the bathroom was identified as a Ruger P89. In the living room, officers found clothes folded on top of a chair with shoes placed nearby. Officers also located $300 in cash, an unspecified number of pills, a brick of marijuana in a black plastic bag in the oven, and a smaller bag of marijuana in a kitchen cabinet. The total weight of the marijuana was 7.14 ounces. The following day, investigators re-examined the parking lot area in the daylight and found seventeen .380 shell casings and one 9mm casing on the walkway outside the apartment door.

After searching Deonte's apartment, police recovered a .44-caliber Charter Arms revolver and a black 9mm Smith & Wesson M&P pistol. Two spent shell casings were removed from the revolver, and eight live rounds were removed from the Smith & Wesson. Investigators confirmed that the nine 9mm cartridges

located near the bathroom had been fired by Waters's Ruger, as well as four of the 9mm bullets recovered elsewhere in the apartment. However, one of the 9mm bullets and three of the 9mm casings recovered from the living room and hallway were fired from the Smith & Wesson pistol. Blood swabs taken from the revolver, the living room floor and hallway wall of Waters's apartment, the parking lot, and the front passenger seat of the Crown Victoria matched Mitchell's DNA. Blood swabs taken from the 9mm Smith & Wesson pistol and the rear passenger seat of the Crown Victoria matched Dorsey's DNA.

The medical examiner testified that Waters had gunshot wounds to his left cheek, arm, and thigh, as well as a fatal gunshot wound to his chest. The "pseudo-stippling" on Waters's skin from several of the gunshots was consistent with those injuries having been inflicted while Waters was positioned behind the bathroom door as wooden fragments from the door struck his skin at the same time that the bullet passed through. Analysis of the two bullets recovered from Waters's body during autopsy revealed that they

were both .44-caliber rounds fired from the Charter Arms revolver.

The State's theory of the case, based on the crime scene evidence and Datieria's statements to officers, was that Waters had undressed, set his clothes out on the living room sofa, and then taken a shower. Before he was able to get dressed, his front door was kicked in and Mitchell and Dorsey started shooting, and Waters retreated to the bathroom where he returned fire. In the ensuing gun battle, Waters was killed, and Mitchell and Dorsey were injured.

### Case No. S22A1202

1. Mitchell first asserts that the verdict is contrary to the principles of justice and equity and against the weight and sufficiency of the evidence and that the trial court erred in failing to grant him a new trial after weighing the evidence as the thirteenth juror. See OCGA §§ 5-5-20 and 5-5-21; *Choisnet v. State*, 292 Ga. 860, 861 (742 SE2d 476) (2013) ("A trial court reviewing a motion for new trial based on these grounds has a duty to exercise its discretion and weigh the evidence and consider the credibility of the

11

witnesses."). However, "a 'thirteenth juror' argument is not properly addressed to this Court as such a decision is one that is solely within the discretion of the trial court." *Lewis v. State*, 314 Ga. 654, 660 (2) n.5 (878 SE2d 467) (2022) (citation and punctuation omitted). And to the extent Mitchell argues that the trial court failed to properly exercise its discretion in this regard, that argument clearly fails. In its order denying Mitchell's motion for new trial, the trial court expressly stated the proper standard:

> The Court further finds, in its discretion, weighing the evidence and the credibility of the witnesses, the verdict was not decidedly and strongly against the weight of the evidence or contrary to the principles of justice and equity. See OCGA §§ 5-5-20, 5-5-21, and 5-5-25. Thus, the Court finds that the evidence does not heavily preponderate against the verdict. *Alvelo v. State*, 288 Ga. 437, 438 [(704 SE2d 787)] (2011).

To the extent that Mitchell also argues the evidence was insufficient to find him guilty beyond a reasonable doubt of the crimes for which he was convicted, we disagree. Although Mitchell notes several inconsistencies in the State's evidence, this Court does not reweigh the evidence or resolve conflicts in testimony. See

*Walker v. State*, 292 Ga. 262, 264 (2) n.2 (737 SE2d 311) (2013) (noting that "the sufficiency of the evidence standard and the discretionary standard given to the trial court pursuant to OCGA § 5-5-21 address two distinct legal issues"). Instead, we defer to the "jury's assessment of the weight and credibility of the evidence." *McIntyre v. State,* 312 Ga. 531, 531 (1) (863 SE2d 166) (2021). And when this Court evaluates the sufficiency of the evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted). So viewed, we conclude the evidence was constitutionally sufficient to support Mitchell's convictions.

The evidence regarding the identity of the shooters was strong because the DNA evidence conclusively tied Mitchell to the revolver that fired the fatal shot and Dorsey to the 9mm Smith & Wesson that had been fired multiple times inside Waters's apartment.

13

Moreover, the evidence showed that Waters's front door had been kicked in, with the deadbolt still engaged and the doorframe damaged, while Waters was still completely nude — undercutting the defense theory that Mitchell and Dorsey only went there to purchase marijuana and that Waters tried to rob them. The ballistics evidence, the medical examiner's testimony, and the circumstances of the shooting in which Waters was shot while naked in his bathroom also tended to strongly contradict Mitchell's and Dorsey's claims of self-defense. Accordingly, this enumeration of error fails. See *Davenport v. State*, 311 Ga. 667, 669-70 (1) (b) (859 SE2d 52) (2021) (holding that the evidence was sufficient to support malice murder and other convictions despite appellant's claim that he shot the victim as a result of a "botched" drug deal and that the jury was authorized to disbelieve appellant's self-defense theory); *Davis v. State*, 306 Ga. 594, 597 (1) (832 SE2d 341) (2019) (evidence sufficient to authorize jury to find appellant guilty of malice murder and other crimes where evidence showed that appellant planned to rob the victim but the robbery went badly, that appellant attempted

14

to fabricate an alibi, physical evidence linked him to the scene of the crime, and appellant hid incriminating items at a friend's house).

2. Mitchell also asserts that the trial court erred when it denied his motion for a mistrial after he claimed that two jurors consumed alcohol while on a lunch break. We do not agree.

The record shows that after the jury was impaneled and sworn, but before opening statements, the trial court recessed for lunch. During the recess, Dorsey's counsel witnessed two jurors being served beverages by the bartender at a nearby restaurant. When court resumed after lunch, Dorsey's counsel brought to the court's attention that two jurors may have consumed what appeared to be alcoholic beverages[5] and proposed that, because they did not know how the alcohol may have affected the jurors, they should recess until the following morning with an admonishment to the jurors.

---

[5] Dorsey's counsel explained that as she was picking up her to-go order, she saw the bartender deliver what appeared to be "margaritas" and each juror take a sip of their beverage. She did not remain in the restaurant and did not know whether the jurors finished their beverages. No evidence was presented to the trial court that directly or definitively established whether the jurors were drinking alcohol as alleged.

Mitchell, however, moved for a mistrial.

The trial court noted that it had not specifically instructed the jurors prior to lunch not to consume alcohol but decided, out of an abundance of caution, to recess proceedings until the next day and to specifically instruct the jurors not to consume anything that might impair their ability to consider the case. On appeal, Mitchell provides no explanation of why the trial court's remedy was insufficient,[6] arguing only that the State did not meet its burden to show that the juror misconduct was non-prejudicial based on this Court's recent holding in *Harris v. State*, 314 Ga. 51 (875 SE2d 649) (2022).

We begin by noting that "[t]he decision to grant a motion for mistrial lies within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a

---

[6] In moving for a mistrial, Mitchell's counsel argued only that there was an old charge instructing bailiffs "to withhold meat and drink while accepted." The trial court noted that the charge does not apply when the court grants a lunch recess for the jurors.

16

fair trial." *Williams v. State*, 313 Ga. 325, 330 (3) (869 SE2d 389) (2022) (citation and punctuation omitted). Mitchell is correct that "[w]hen irregular juror conduct is shown, there is a presumption of prejudice to the defendant, and the prosecution carries the burden of establishing beyond a reasonable doubt that no harm occurred." *Harris*, 314 Ga. at 53 (2) (citation and punctuation omitted). However, we have also explained that the State may carry this burden by establishing that the "juror misconduct was an immaterial irregularity without opportunity for injury." Id. at 54 (2) (citation and punctuation omitted).

Here, in opposing the motion, the State argued that the alleged conduct was not so prejudicial as to require a mistrial and that it could be cured simply by coming back the following day with more specific instructions to the jurors. And in denying the motion, the trial court specifically noted that it was unclear exactly what was in the beverages or how much was consumed by the two jurors and agreed to recess until the following day out of an abundance of caution. Pretermitting whether Mitchell established juror

17

irregularity due to the consumption of alcohol as alleged here, we conclude that the alleged misconduct was a type of "immaterial irregularity without opportunity for injury." *Harris*, 314 Ga. at 54 (2) (citation and punctuation omitted). See also *State v. Clements*, 289 Ga. 640, 643 (1) (715 SE2d 59) (2011) (noting that, while there is a presumption of prejudice to the defendant when an irregularity in the conduct of a juror is shown, some irregularities, such as a juror's unauthorized contact that did not involve discussions about the merits of the case, are inconsequential). Mitchell's reliance on *Harris* is misplaced as that case involved extraneous sentencing information being shared between jurors during deliberations, a situation that is not analogous to the alleged misconduct here, which did not involve the merits of the case, occurred before opening statements (long before deliberations began), and was subject to the trial court's corrective action. See *Harris*, 314 Ga. at 56 (2). Accordingly, the trial court did not abuse its direction in denying Mitchell's motion for a mistrial.

*Case No. S22A1304*

3. In his sole enumeration of error, Dorsey asserts that the evidence was not sufficient to prove his guilt beyond a reasonable doubt because the testimony from the State's own witnesses showed that Dorsey and Mitchell went to Waters's apartment to buy marijuana, not to steal it; Dorsey and Mitchell did not have an accomplice waiting for them in a getaway car; nothing was taken from Waters's apartment; and the evidence was otherwise "wide open to dispute."

However, as we explained in Division 1, this Court does not reweigh the evidence or resolve conflicts in testimony and instead views the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. See *McIntyre,* 312 Ga. at 531 (1). So viewed, we conclude that the evidence was sufficient to support Dorsey's convictions as a direct participant or as a party to the crimes for the reasons stated in Division 1. See OCGA § 16-2-20 (defining "party to a crime"); *Pritchett v. State*, 314 Ga. 767, 771 (1) (879 SE2d 436) (2022) (where

defense theory was inconsistent with the physical evidence, jury was authorized to find beyond a reasonable doubt that defendant did not act in self-defense); *Teasley v. State*, 288 Ga. 468, 469 (704 SE2d 800) (2010) (that defendant did not actually fire the gun that fatally wounded the victim was immaterial to his conviction as a party to the crime of malice murder). Accordingly, this enumeration of error fails.

*Judgments affirmed. All the Justices concur.*

Decided December 20, 2022.

Murder. DeKalb Superior Court. Before Judge Jackson.

*Davis Hewitt Law Firm, William D. Hewitt*, for appellant (case no. S22A1202).

*Charles H. Frier*, for appellant (case no. S22A1304).

*Sherry Boston, District Attorney, Jason M. Rea, Deborah D. Wellborn, Lenny I. Krick, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.